Dare Investments v. Arent Fox



SEALED

Peter Strojnik, Arizona Bar No. 006464
**PETER STROJNIK, P.C.**
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012
Telephone: 602-524-6602
Facsimile: 602-296-0135
E-mail: Strojnik@aol.com
Attorneys *pro hac vice* for Plaintiff (pending)
Lead Attorney

Maoputasi Young, Utah Bar No. 11247
1801 N 1120 W
Provo, UT 84604
Telephone: 801-655-1421
Facsimile: 888-267-5887
E-mail: tyoung@altamirada.com

FILED
U.S. DISTRICT COURT

2011 MAR 18  P 2: 50

DISTRICT OF UTAH

BY:_____
    DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

DARE INVESTMENTS, LLC, a Utah limited liability company,

Plaintiff,

vs.

ARENT FOX LLP f/k/a ARENT FOX KINTNER PLOTKIN & KAHN, PLLC a New York Limited Liability Partnership,

Defendant.

NO.

## **COMPLAINT**

Case: 2:11cv00266
Assigned To : Kimball, Dale A.
Assign. Date : 3/18/2011
Description: Dare Investments v.
Arent Fox et al

## NATURE OF THE CASE

Plaintiff alleges that Defendant Arent Fox acted in a dual capacity as the attorney for a debtor in bankruptcy and as the escrow agent in the sale of

- 1 -

bankruptcy assets.   Arent Fox knew that its approved administrative claim for $1,957,067.67 was in jeopardy unless some or all of the Bankruptcy Assets were sold. In the subsequent sale of the Bankruptcy Assets, Dare Investments as lender wired $5 million to Arent Fox as Escrow Agent. At the time when Arent Fox accepted Dare's $5 million in escrow, Arent Fox knew that Dare's funding of $5 million was based on fraud. Arent Fox affirmatively concealed the fraud, failed to disclose the fraud, aided and abetted the buyers in perpetrating the fraud, and conspired with the buyers to defraud Dare out of $5 million. Upon the completion of the sale of Bankruptcy Assets, Arent Fox paid itself $1,440,000 all of which came from Dare's $5million. Plaintiff brings this action for breach of contract, fraudulent inducement, breach of fiduciary duty, fraud by failure to disclose and constructive fraud, aiding and abetting fraud, and conspiracy to defraud.

## PARTIES

1.  Plaintiff Dare Investments, LLC ("Dare") is a Utah limited liability company.

2.  Defendant ARENT FOX, LLP is a New York based law firm with its principal place of business at 1675 Broadway, 25th Floor, New York, New York 10019.

## JURISDICTION AND VENUE

3.  The amount of controversy exceeds $75,000.00.

4.  The United States District Court of the State of Utah has jurisdiction over this matter by virtue of 28 U.S.C. §1332 (diversity of citizenship).

Dare Investments v. Arent Fox

5.   Venue is proper pursuant to Under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in the State of Utah.

## FACTUAL ALLEGATIONS

### Arent Fox's Representation Of Debtor In Possession and Its Interest In $1,957,067.67 for Payment of Administrative Fees and Costs

6.   On July 12, 2002, First Connecticut Consulting Group., Inc. filed for the protection of the United States Bankruptcy Code, Chapter 11, in the United States Bankruptcy Court for the District of Connecticut under cause number 02-50852-AHWS ("FCCG Bankruptcy") FCCG Bankruptcy remains pending as of the date of this Complaint.

7.   FCCG Bankruptcy involves a complex series of interrelated transactions, debtors and claims. The Court docket in the FCCG Bankruptcy discloses 9 debtors, over 100 parties and claimants and  large number of lawyers, over 1900 docket entries, 9 adversary proceedings (not including collateral state litigations and disputes) and 125 claims totaling over $20 million.

8.   On May 14, 2003, the Court in the FCCG Bankruptcy approved and authorized the retention of Defendant Arent Fox as special counsel for the Debtors. (Doc 246 - Docket References are to the FCCG Bankruptcy)

9.  On August 5, 2003, Arent Fox filed its First Interim Application for compensation. In it, Arent Fox requested payment of $783,903.50 for fees and $39,726.71 for costs. (Doc 371)

10. On July 19, 2005, Arent Fox filed its Second Interim Application for compensation. In it, Arent Fox requested payment of $1,239,791.50 for fees and $98,016.74 for costs. (Doc 742)

11. On August 29, 2005, the Bankruptcy Court approved a total of $1,957,067.67 for payment to Arent Fox. (Docs 814, 815)

12. The Bankruptcy Estate did not have sufficient funds to pay Arent Fox its approved fees and costs.

13. For Arent Fox to be paid its approved fees and costs, Arent Fox's client, the Debtor in Possession, would have to sell some or all of the Bankruptcy Assets.

## Arent Fox's First Attempt to Sell Bankruptcy Assets

14. On March 11, 2005, Arent Fox filed a motion to sell substantially all of the Bankruptcy Assets to SWJ Holdings, LLC ("SWJ"). (Doc 595)

15. SWJ was organized, established, owned and/or controlled by one William Mournes. ("Mournes") and others.

16. On information and belief, SWJ was organized for the express purpose of acquiring the Bankruptcy Assets. Upon information and belief, SWJ did not have any assets of its own to purchase the Bankruptcy Assets. According to the

Dare Investments v. Arent Fox

allegations by the current Trustee in the FCCG Bankruptcy, SWJ's purchase of the Bankruptcy Assets was intended as a pass-through of the Bankruptcy Assets back to one of the Debtors, James Licata, free and clear of any liens, encumbrances or claims. (Doc 1-1, Adversary No. Case 09-05010)

17. SWJ represented that its purchase of the Bankruptcy Assets was not subject to any financing. In fact, SWJ represented that SWJ "ha[d] the financial resources to consummate the transactions contemplated herein, to pay the Purchase Price at the time and in the manner set forth herein, and to perform its obligations hereunder." (Doc 904 at ¶5)

18. SWJ's representation that it "ha[d] the financial resources to consummate the transactions contemplated herein, to pay the Purchase Price at the time and in the manner set forth herein, and to perform its obligations hereunder" was false.

19. On June 21, 2005, the Debtors auctioned the Bankruptcy Assets to SWJ for $8,950,000.00. On the same day, the Court signed an Order Authorizing and Approving the sale of the Bankruptcy Assets to SWJ. (Doc 716)

20. Pursuant to the sale documents, SWJ was required to close the transaction by June 27, 2005.

21. SWJ paid the initial deposit of $400,000.00, but was unable to close the transaction by the close date on June 27, 2005, and the sale failed to close.

22. On October 12, 2005, the Court approved a modification of the Sale of the Bankruptcy Assets to SWJ by increasing the sale price and accepting as security certain Bangkok Bank Guarantees ("BBG's").

23. The BBG's were issued by the Bangkok Bank PLC in the face amount of $50 million dollars. Cobra Ventura Equities, LLC ("Cobra") was the named beneficiary of the BBG's. (Doc 844)

24. Upon information and belief, Cobra was organized, owned and/or controlled by Mournes, the same person who controlled SWJ. Upon information and belief, Cobra was a member of SWJ. It appeared that Cobra and SWJ were each other's *alter egos*.

25. Upon information and belief, the BBG's were originated by Mournes through his Asian associates.

26. In October of 2005, it was agreed by and between the Debtor, SWJ and Cobra that the BBG's would be held by Arent Fox in a bank vault. The conditions pursuant to which the BBG's could be presented for payment, released, or returned to Cobra were all set forth in the October 12. 2006 Order. (Doc 844) These conditions did not permit Arent Fox to release the possession of the BBG's to anyone without a prior court order.

27. At a hearing on November 16, 2005, it was revealed that Arent Fox released the possession of the BBG's and delivered them to the Societe Banque Privee,

S.A. of Geneva, Switzerland ("SBP") in an apparent attempt to cash them. This release violated the Court's previous orders. The Bankruptcy Judge determined that the Court Order "was violated" by the transfer of the BBG's and stated "whether or not sanctions will be imposed because of that is something I'll take up on a later date."

28. At the hearing on November 16, 2005, it was also revealed that SWJ was unable to close the purchase of the Bankruptcy Assets.

## Arent Fox Learns That The BBG's Are Fraudulent

29. No later than February 9, 2006, Arent Fox received verbal confirmation from Bangkok counsel that the BBG's were fraudulent. (Doc 1146-2) On February 10, 2006, Arent Fox received a written confirmation from Bangkok counsel that the BBG's were in fact fraudulent. Exhibit 1.

30. The fraudulent nature of the BBG's significantly jeopardized Arent Fox's ability to get paid its approved fees and costs in the amount of $1,957,067.67.

## Arent Fox Begins Negotiating a New Deal with SWJ

31. At about the same time that Arent Fox learned that the BBG's were fraudulent, that is, on or about February 9, 2006, Arent Fox began discussions with SWJ and the Creditor's Committee regarding a possible replacement deal.

32. Arent Fox became acutely aware that the likelihood of Arent Fox being paid for fees and costs would be greatly diminished unless SWJ and/or Cobra found

a money man, like Dare, who would lend cash money to SWJ and/or Cobra to close the purchase of the Bankruptcy Assets.

33. In early February, 2006 Cobra, through its Utah Attorney Gordon Duval, negotiated with Dare's principal, Richard McCloskey, a request to lend $5 million in exchange for a $12 million Note, fully secured by the Bankruptcy Assets and the BBG's.

34. McCloskey agreed, in principle, to the proposed loan transaction.

35. Cobra, through Gordon Duval, immediately advised Arent Fox that it found a lender to fund $5 million.

36. On February 12, 2006, Duval issued a letter to Arent Fox in which he disclosed new proposed terms of the purchase; this proposal included a disclosure of Dare as an investor in Cobra. Exhibit 2.

37. Thereafter, Arent Fox was in close communications with Duval and was closely involved in the preparation of transactional documents. (Doc 1146-2)

38. In order to facilitate the $5 million funding, SWJ, Cobra and Mournes as borrowers and Dare as lender entered into a Master Loan Agreement dated February 14, 2006. Exhibit 3.   Pursuant to the terms of the Master Loan Agreement, Cobra agreed to grant to Dare a senior security position in the BBG's. Id.

39. The promise of a security in the BBG's was fraudulent because the BBG's themselves were fraudulent.

40. Arent Fox knew that the Master Loan Agreement contained a term granting Dare security in the fraudulent BBG's.

41. In order to secure the previously approved payment of $1,957,067.67 (Docs 814, 815) to itself, Arent Fox agreed to prepare an Escrow Agreement and to receive Dare's $5million in escrow. The Escrow Agreement effective February 14, 2006, is appended hereto as Exhibit 4.

42. On February 15, 2006, Dare wired $5 million to Arent Fox.

43. As its Escrow Agent, Arent Fox owed Dare, its principal, a fiduciary duty.

44. At the time of the execution of the Escrow Agreement and prior thereto, Arent Fox knew, but failed to disclose, with respect to SWJ's and Cobra's financial abilities to repay the loan:

    a.  That SWJ, Cobra and Mournes committed to paying Dare Investments the sum of $12 million in return for Dare's agreement to advance $5 million into Arent Fox's Escrow Account; and

    b.  That Dare was making the $5 million advance into Arent Fox's Escrow Account in reliance on SWJ's and Cobra's ability to pay Dare the sum of $12 million dollars; and

    c.  That neither SWJ nor Cobra had any assets of their own; and

  d. That SWJ had previously misrepresented its ability to fund the acquisition of the Bankruptcy Assets; and

  e. That SWJ did not have funding to close the transaction; and

45. At the time of the execution of the Escrow Agreement and prior thereto, Arent Fox knew, but failed to disclose, with respect to Dare's security interest in the Bankruptcy Assets and BBG's:

  a. That the $5 million loan transaction was to be secured, in part, by the Bankruptcy Assets and BBG's as disclosed in the 02-12-06 letter from Gordon Duval and the 02-14-06 Master Loan Agreement; and

  b. That Dare relied, in part, on the validity of the BBG's in advancing $5 million into Arent Fox Escrow; and

  c. That Dare relied, in part, on the validity and marketability of the Bankruptcy Assets in advancing $5 million into Arent Fox Escrow; and

  d. That the BBG's were in fact fraudulent and worthless; and

  e. That one Peter Mocco, through his attorney James Scarpone, was making claims of ownership to the Bankruptcy Assets and that, therefore, the Bankruptcy Assets were not marketable and would not provide valuable security for the Dare loan.

Dare Investments v. Arent Fox

46. At the time of the execution of the Escrow Agreement and prior thereto, Arent Fox knew, but failed to disclose, with respect to the use of the Dare $5 million loan proceeds:

   a. That Arent Fox and other attorneys, Particularly, one Alan Brody, Esq. of Buchanan Ingersoll, PC, Princeton, New Jersey, associated with the FCCG Bankruptcy would be paid their fees and costs out of Dare's $5 million; and

   b. That any knowledge on the part of Dare that Arent Fox and others would be paid out of the Dare's $5 million would alert Dare that the value of the Bankruptcy Assets were less than represented and would provide a lesser security for the Dare $5 million loan; and

   c. That unless an uninformed investor were found to make an infusion of cash into the Bankruptcy Estate through a sale of the Bankruptcy Assets of otherwise, Arent Fox had a lesser chance, if any, of being paid; and

   d. That Arent Fox was looking to the infusion of cash from Dare for the payment of its fees, costs and expenses; and

   e. That Arent Fox owed conflicting fiduciary duties to the Debtor as its attorney and Dare as its principal under the Escrow Agreement; and

   f. That Arent Fox had a personal interest in the payment of money by Dare into the Escrow; and

g. That Dare relied, in part, on the validity of the BBG's in transferring $5 million into Escrow; and

h. That Dare relied on Arent Fox to fulfill its fiduciary obligations of disclosure to Dare; and

i. That any knowledge on the part of Dare that SWJ had previously misrepresented its ability to pay the purchase price was fraudulent would, or could, have caused Dare to not pay $5,000,000.00 into Arent Fox's Escrow; and

j. That any knowledge on the part of Dare that the BBG's were fraudulent would, or could, have caused Dare to not pay $5,000,000.00 into Arent Fox's Escrow.

47. Arent Fox also knew, but failed to disclose, that any transaction involving the BBG's and any promise to pay based on the BBG's would be fraudulent because the BBG's themselves were fraudulent.

48. Arent Fox also knew, but failed to disclose, that SWJ had previously misstated its ability to fund the purchase of the Bankruptcy Assets, and that neither SWJ nor Cobra had any funds with which to repay Dare. Further, Arent Fox knew that even if the Bankruptcy Assets were transferred to SWJ, the Bankruptcy Assets were subject to claims by Peter and Lorraine Mocco and, therefore, unmarketable.

## Arent Fox Affirmatively Hides The Fraudulent Nature of BBG's

49. As previously alleged, on Sunday, February 12, 2006, Gordon Duval as the attorney for Cobra made an offer to Arent Fox which indicated that McCloskey was willing to "pay on behalf of SWJ the sum of $5,000,000.00 in immediately available funds to the trust account of Arent Fox for disbursement to the Debtor's estates" in order to complete the sale of the Bankruptcy Assets. On the same day Arent Fox circulated an e-mail regarding the fraudulent BBG's and Dare's ability to pay $5,000,000.00 into Arent Fox's account. Exhibit 1:

> I received a call from the attorney in Thailand that wrote this letter.   He explained in greater detail what he believes we are dealing with. **Apparently this is not the first time BGs of this type have been used in an attempted fraud. The bank has in the past referred several similar situations to the Thai authorities for review.** He did not say these notes have been referred. He also told me that the bank said that the registration numbers are not in the form that they would use for these types of guarantees.   He believes we are dealing with worthless and fraudulent paper.

> We should discuss how to bring this to the attention of the court and the authorities.   Brody [Counsel for Creditor's Committee] believes that all of the parties affected by this may have claims against several parties including Proskauer [SWJ's law firm].   They argue that Dale [Schreiber, SWJ's lawyer] was either a knowing party to this fraud or was grossly negligent. They have also raised the question of if the estate has the rights of SWJ does SWJ have claims against [its lawyers] for representing SWJ and Cobra. Schreiber still argues that the Notes are authentic and that he can explain the responses from the bank. **Schreiber and Gordon Duval also insist that they will, prior to Wed fund a compromise proposal. Most BK judges will take the money, if offered and not involve themselves in the question of possible criminal acts by the non debtor. That is all I know at this time. The committee is fully aware of this.   In fact they did their own analysis of whether to go to court or wait until Wed.** (emphasis suplied)

50. Despite its knowledge of the BBG fraud, Arent Fox chose not to disclose it to the Bankruptcy court. Instead, it chose to wait until Wednesday, February 15, 2006, to see whether Dare would fund the sale of the Bankruptcy Assets.

51. Once Arent Fox became satisfied that Dare could immediately transfer $5,000,000.00 to Arent Fox, it prepared an Escrow Agreement dated February 14, 2006. Exhibit 4.

52. The following day, February 15, 2006, Dare wired $5,000,000.00 to Arent Fox.

53. At this time, both Arent Fox and Alan Brody of Buchanan Ingersoll, P.C. (the attorneys for the Creditors' Committee) had a personal interest in the transaction by virtue of their respective claims for fees and costs.

54. Instead of advising the Court of the BBG fraud, on February 22, 2006, Arent Fox and Buchanan Ingersoll jointly moved to amend the prior orders of the Bankruptcy Court approving the sale of the Assets to SWJ. (Docs 902, 904) The [Proposed] Order filed along with the Joint Motion contained the following provision (Doc 904-2):

> The obligations of SWJ under the Note [to Debtor] shall be secured by duly perfected security interests on all of the Acquired Assets (as that term is defined in the FAAPA) conveyed to SWJ at the Closing, which security interests are hereby duly perfected without the need of further filings or further order of this Court ("the Debtors' Security Interests"). The obligations of CV under the Guaranty shall be secured by the proceeds derived from any transfer, sale, pledge, redemption or other form of collection of the Bank Guarantee (as defined in the Order dated October 7, 2005) and any of the other eleven similar bank guarantees now held by CV (collectively, "the Guarantees") ("CV Financing Transaction"), which security interests are hereby duly perfected without the need of further filings or further order of this Court.

55. The effect of the [Proposed] Order submitted by Arent Fox and Buchanan Ingersoll was to remove Dare's security interest in the BBG's. The removal of Dare's security interest in BBG's could potentially avoid liability on the part of Arent Fox and Buchanan Ingersoll to Dare for failure to disclose that the BBG's were fraudulent.

56. Arent Fox did not disclose to Dare that it was seeking an Order from the Court which would omit Dare's security interest in the BBG's.

57. At the time of the submission of the [Proposed] Order, Arent Fox and Buchanan Ingersoll both knew that it was in their interest to receive $5,000,000.00 from Dare and to keep quiet about the fraudulent BBG's.

58. At this time Arent Fox and Buchanan Ingersoll also believed – as disclosed in the February 12, 2006 e-mail, Exhibit 1, – that "[m]ost BK judges will take the money, if offered and not involve themselves in the question of possible criminal acts by the non debtor".

59. As proposed in the February 22, 2006 [Proposed] Order (Doc 904-2), the March 9, 2006 Order (Doc 917) also provided that SWJ would issue a $5.85 million Note to the Debtor which would be secured by the BBG's:

> The obligations of SWJ under the Note shall be secured by duly perfected security interests on all of the Acquired Assets (as that term is defined in the FAAPA) conveyed to SWJ at the Closing, which security interests are hereby duly perfected without the need of further filings or further order of this Court ("the Debtors' Security Interests"). The obligations of CV under the Guaranty shall be

secured by the proceeds derived from any transfer, sale, pledge, redemption or other form of collection of the Bank Guarantee (as defined in the Order dated October 7, 2005) and any of the other eleven similar bank guarantees now held by CV (collectively, "the Guarantees") ("CV Financing Transaction"), which security interests are hereby duly perfected without the need of further filings or further order of this Court.

60. March 9, 2006 Order (Doc 917) modified Dare's security provision in the original Master Loan Agreement, Exhibit 3, by granting security in the BBG's to Debtor and taking it away from Dare.

**The Closing**

61. Closing occurred on March 13, 2006. At closing, Arent Fox's client conveyed the assets to SWJ by assignment. The consideration was (i) the sum of $400,000 that had previously been deposited with Debtors' counsel on July 5, 2005, (ii) the sum of $ 5,000,000 deposited with Debtors' counsel on February 15, 2006 by Dare, and (iii) a Promissory Note in the amount of $ 5.85 million with an interest rate of 9% per annum with all interest and principal payable on December 15, 2006.

62. As part of the Closing, SWJ and Cobra submitted to Dare the Amended and Restated Master Loan Agreement.  The Amended and Restated Master Loan Agreement omitted from its provisions Dare's security interest in the BBG's. Exhibit 5.

63. Arent Fox did not alert Dare that the Restated Master Loan Agreement omitted from its terms Dare's security interest in the BBG's.

64. As part of closing, SWJ and Cobra issued a Promissory Note in the principal amount of $12 million in favor of Dare. Exhibit 6.

65. As part of closing, SWJ, Cobra and Mournes issued to Dare a Pledge and Security Agreement through which Mournes granted Dare a first lien on and security interest in all of the equity interests Mournes had in Cobra. Exhibit 7.

66. As part of closing, the Debtor, SWJ, Cobra and Dare entered into a Security and Intercreditor Agreement. Exhibit 8.

67. After close, Arent Fox received $1,440,000 from the proceeds of the Dare $5 million loan. (Doc 1146)

68. On 10-18-06, Arent Fox filed a Motion to Withdraw as counsel for Debtors. (Doc 1159)

69. On November 22, 2006, the Court granted Arent Fox's Motion to Withdraw Appearances (Doc. 1189).

## COUNT 1
## Breach of Contract – Good Faith and Fair Dealing

70. Plaintiff realleges all allegations heretofore set forth.

71. The Escrow Agreement, Exhibit 4, created a principal-agent relationship between Arent Fox and Dare.

72. The Escrow Agreement, Exhibit 4, contained an implied covenant of good faith and fair dealing, pursuant to which Defendant Arent Fox was prohibited from

taking any action that would have the effect of injuring the right of Dare to receive the fruits of the Escrow Agreement.

73. The fruits of the Escrow Agreement include Dare's reasonable expectations that Arent Fox would abide by its duties as the escrow agent, including its fiduciary duty and the highest kind of loyalty to Dare.

74. The fruits of the Escrow include Dare's reasonable expectations that Arent Fox would not aid and abet SWJ and Cobra in the fraud committed on Dare by SWJ and Cobra.

75. The fruits of the Escrow Agreement include Dare's reasonable expectations that Arent Fox would not funnel Dare's $5 million loan for its own benefit.

76. The fruits of the Escrow Agreement include Dare's reasonable expectations that Arent Fox would disclose known fraud attempted to be perpetrated by other parties to the Escrow Agreement.

77. Arent Fox subverted the intent of the contract by accepting money in order to pay itself the fees and costs approved by the Court, by failing to make disclosures of its own interest in the transaction, by its aiding and abetting SWJ's and Cobra's fraud on Dare; by conspiring with SWJ and Cobra to defraud Dare, and by failing to disclose known fraud, all as more fully alleged below.

78. Dare has been proximately damaged by Arent Fox's breach of the covenant of good faith and fair dealing.

## COUNT 2
## Fraud in the Inducement

79. Plaintiff realleges all allegations heretofore set forth.

80. Arent Fox knew the material facts listed in Paragraphs 44 – 48 above.

81. Arent Fox failed to disclose the material facts listed in Paragraphs 44 – 48 above.

82. Dare relied on the non-disclosure of the facts in entering into the Escrow Agreement.

83. Dare reasonably relied on Arent Fox's representations and omissions in entering into the Escrow Agreement and paying $5,000,000.00 into Arent Fox's Escrow.

84. Dare was proximately damaged by Arent Fox's breach of contract and fraudulent inducement.

## COUNT 3
## Breach of Fiduciary Duty

85. Plaintiff realleges all allegations heretofore set forth.

86. By virtue of the Escrow Agreement, Arent Fox became Dare's fiduciary.

87. Arent Fox owed Dare the highest duty of loyalty and disclosure.

88. As the attorney for the Debtor in Possession, Arent Fox also owed the fiduciary duty to Dare as creditor.

89. Arent Fox breached its fiduciary duty to Dare by self dealing, aiding and abetting SWJ's and Cobra's fraud, and failing to disclose the information disclosed in ¶¶ 44-48 above and elsewhere in this Complaint.

90. Dare was damaged by Arent Fox's Breach of Fiduciary Duty.

## COUNT 4
**Fraud by a Fiduciary - Intentional Failure to Disclose - Constructive Fraud**

91. Plaintiff realleges all allegations heretofore set forth.

92. At times relevant to this claim, Arent Fox was Dare's escrow agent; as such it owed Dare a duty of disclosure.

93. Once a fiduciary relationship is established, the fiduciary must prove that no deception was practiced, no undue influence was used, and that all was fair, open and voluntary, and well understood.

94. In addition to Arent Fox's burden of proof that no deception was practiced on Dare, and that Arent Fox was fair and open, Dare alleges the following additional averments:

   a. Arent Fox knew facts that were material to the escrow transaction and the entire Debtor – SWJ – Cobra – Dare transaction, including the facts disclosed in ¶¶44-48 above; and

   b. Arent Fox failed to make disclosure of the above cited material facts; and

    c.  Arent Fox had the incentive to deceive Dare because Arent Fox's payment for approved fees and costs depended on Dare's payment of $5 million; and

    d.  Dare relied that Arent Fox would not violate its fiduciary duties to Dare.

95. Arent Fox's failure to disclose was negligent and/or intentional.

96. Had Dare known the facts that were known to but undisclosed by Arent Fox, it would not have entered into the loan transaction with SWJ and Cobra.

97. Dare has been damaged by Arent Fox's breach of fiduciary duty.

## COUNT 5
### Negligent Misrepresentation / Failure to Disclose

98. Plaintiff realleges all allegations heretofore set forth.

99. This count is brought in addition to and in the alternative to the preceding count.

100.  At times relevant to this claim, Arent Fox was Dare's escrow agent; as such it owed Dare a duty of disclosure.

101.  Once a fiduciary relationship is established, the fiduciary must prove that no deception was practiced, no undue influence was used, and that all was fair, open and voluntary, and well understood.

102.  In addition to Arent Fox's burden of proof that no deception was practiced on Dare, and that Arent Fox was fair and open, Dare alleges that Arent Fox breached its duty of disclosure.

103.   Arent Fox's breach of duty to disclose was negligent or grossly negligent.

104.   Had Dare known the facts that were known to but undisclosed by Arent Fox, it would not have entered into the loan transaction with SWJ and Cobra.

105.   Dare has been damaged by Arent Fox's breach of fiduciary duty.

## COUNT 6
### Aiding and Abetting SWJ's and Cobra/Ventura's Fraud

106.   Plaintiff realleges all allegations heretofore set forth.

107.   SWJ and Cobra defrauded Plaintiff into lending SWJ $5,000,000.00 by, inter alia, agreeing to pay a $12 million Promissory Note when they had no ability to do so and by agreeing to secure the Note with BBG's.

108.   Arent Fox was aware of the wrongful conduct by SWJ and Cobra.

109.   Arent Fox substantially assisted SWJ and Cobra in their fraud on Dare as more fully described above.

110.   As a direct and proximate result of Arent Fox's aiding and abetting, Dare was damaged.

## COUNT 7
### Conspiracy to Defraud

111.   Plaintiff realleges all allegations heretofore set forth.

112.   Arent Fox, Buchanan Ingersoll, SWJ and Cobra entered into a corrupt agreement, direct or implied, to cause Dare to pay $5,000,000.00 in order to, in part, assure payment for fees and costs to Arent Fox and Buchanan Ingersoll.

113.   Arent Fox committed overt acts in furtherance of the agreement as more fully described above.

114.   Arent Fox intentionally participated in the furtherance of a plan or purpose to cause Dare to advance $5,000,000.00 as more fully described above.

115.   Dare was proximately damaged by Arent Fox's conspiracy by funding the purchase of the Bankruptcy Assets.

## PRAYER FOR RELIEF

116.   Defendant Arent Fox' conduct above directly and proximately damaged Plaintiff Dare Investments in an amount no less than $5,500,000.00 or in such greater amount as may be proven at trial.

117.   Arent Fox's conduct was intentional and premeditated, without regard for the rights of Dare.  It was designed to benefit its own financial interests at the expense of Dare.  Therefore, Dare prays for an award of punitive damages in an amount to be proven at trial, but in no event less than $5,000,000.00.

118.   Dare also prays for an award of costs and attorney's fees pursuant to applicable law.

119.   Dare also prays for pre judgment and post judgment interest as provided by law.

Dare Investments v. Arent Fox

120.  Dare has incurred costs for loss of use of the funds forwarded to Arent Fox's Escrow Account, loss of time and opportunity, and other consequential damages to be more fully proven at the time of trial.

121.  Dare further requests such other and further relief as the Court may deem just and proper.

### REQUEST FOR TRIAL BY JURY

Plaintiff respectfully requests a trial by jury.

RESPECTFULLY SUBMITTED this 16th day of March, 2011.

THE LAW FIRM OF PETER STROJNIK, P.C.

Peter Strojnik, Esq.
Attorney *pro hac vice* (pending) for Plaintiff

Maoputasi Young, Esq.