Peter Strojnik, Arizona Bar No. 006464
**PETER STROJNIK, P.C.**
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012
Telephone: 602-524-6602
Facsimile: 602-296-0135
E-mail: Strojnik@aol.com
Attorneys *pro hac vice* for Plaintiff (pending)
Lead Attorney

Maoputasi Young, Utah Bar No. 11247
1801 N 1120 W
Provo, UT 84604
Telephone: 801-655-1421
Facsimile: 888-267-5887
E-mail: tyoung@altamirada.com

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DARE INVESTMENTS, LLC, a Utah limited liability company, | NO. 2:11-cv-00266 |
| | Honorable Judge Dale A. Kimball |
| Plaintiff, | |
| vs. | **AFFIDAVIT OF RICHARD MCCLOSKEY** |
| ARENT FOX LLP f/k/a ARENT FOX KINTNER PLOTKIN & KAHN, PLLC a New York Limited Liability Partnership, | |
| Defendant. | |

The undersigned Richard McCloskey submits the following Affidavit in

support of (1) Dare Investments' Response to Arent Fox's Motion to Dismiss, (2)

1

Dare Investment's Response to Arent Fox's Motion for Change of Venue and (3) Dare Investments' Motion for Summary Judgment.

1. My name is Richard McCloskey. I am of sufficient age and mental acuity to make the statements that follow. I make these statements upon my personal knowledge unless otherwise indicated.

2. I am, and have been at all times relevant hereto, the managing member of Dare Investments, LLC, a Utah limited liability company. I am authorized to make this Affidavit.

3. In early 2006, I was approached by Gordon Duval, a Utah attorney, in connection with a $5 million loan to SWJ Holdings, LLC. The loan to SWJ was to be used for the purpose of purchasing certain assets from a pending bankruptcy proceeding in the District of Connecticut under cause number 02-50852-AHWS ("FCCG Bankruptcy").

4. Mr. Duval did not represent me or Dare Investments or any of its principals. I understood that Mr. Duval was the attorney for an entity commonly referred to as Cobra/Ventura. In turn, Cobra/Ventura was the named beneficiary of certain Bangkok Bank Guarantees in the face amount of $50 million.

5. I retained Mr. George Pratt, Esq., of the Jones Waldo law firm, to assist Dare in the loan transaction.

2

6. I learned that the loan was to be extended to SWJ Holdings, LLC ("SWJ") so that SWJ could purchase FCCG Bankruptcy Assets. Since Dare's loan was to be secured, in part, by SWJ's collateral assignment of the Bankruptcy Assets to Dare, I authorized a limited investigation into the validity of the Bankruptcy Assets.

7. I became aware that New Jersey residents, Mr. and Mrs. Mocco, were claiming ownership in the Bankruptcy Assets. Therefore, I insisted that the title to certain of these assets, notably the mortgage on 150 acres of property in Sayreville, New Jersey, be insured by Chicago Title Insurance Company.

8. The loan to SWJ was to be further secured by certain Bangkok Bank Guarantees with the face value of $50 million.

9. I did not conduct, either directly or indirectly, due diligence into the validity of the BBG's, nor did I have, directly or indirectly, the wherewithal to conduct such an investigation into Thai banking instruments.

10. In order to facilitate the $5 million funding, SWJ and Cobra/Ventura and Dare as lender entered into a Master Loan Agreement dated February 14, 2006. Exhibit 1. Pursuant to the terms of the Master Loan Agreement, Cobra agreed to grant Dare a senior security position in the BBG's:

3

10. **Bangkok Bank Guarantee.** SWJ's agreement with the Debtor and its creditors shall provide for abandonment or redemption of the Debtors' claim on the Bangkok Bank bank guarantee upon disbursement of the Disbursement and the delivery of the appropriate security documents. Cobra shall grant Dare a senior interest in the Bangkok Bank bank guarantee as additional collateral for the Note. If the Note is not paid in full by May 16, 2006, Cobra consents to the grant of security interest in the bank guarantee in favor of a third-party lender to re-finance the Note and pay all obligations to Dare and hereby irrevocably appoints Dare as its attorney-in-fact for such purpose.

11. The Master Loan Agreement also provided that the $5 loan would be funded directly to Arent Fox's trust account:

1. **Payment on Behalf of SWJ.** No later than noon on February 15, 2006, Dare will pay on behalf of SWJ and Cobra $5,000,000 to the trust account of Arent Fox, counsel for the Debtor (the Disbursement"), for disbursement to the appropriate parties in the jointly administered bankruptcy cases, which advance shall constitute a loan to SWJ and Cobra that shall be evidenced by a promissory note in form reasonably acceptable to counsel for Dare (the "Note").

12. Pursuant to the terms of the Master Loan Agreement, Arent Fox prepared, and I signed, the Escrow Agreement which provided that Dare would fund the loan directly to Arent Fox. Exhibit 2.

13. At the time I executed the Escrow Agreement, I knew that Arent Fox was a large and prestigious New York law firm.

14. At the time of the execution of the Escrow Agreement, I relied that Arent Fox would conduct its duties as the escrow agent according to law.

15. At the time of the execution of the Escrow Agreement, I relied that Arent Fox, as lawyers, would conduct its duties in accordance with New York rules and regulations governing lawyers.

4

16. At the time of the execution of the Escrow Agreement, I relied that Arent Fox would make disclosure of all material information relating to the transaction, including the material information referenced in the following paragraphs 17 - 20.

17. At the time of the execution of the Escrow Agreement, I relied that Arent Fox would not accept Dare's $5 million if it knew that the BBG's were fraudulent.

18. At the time of the execution of the Escrow Agreement, I relied that Arent Fox would disclose any and all material information it had regarding SWJ's ability to pay Dare according to the loan terms between Dare and SWJ, and all other material information that it was obliged to disclose according to law.

19. At the time of the execution of the Escrow Agreement, I relied that Arent Fox would disclose any and all self-interest it had in the sale of the Bankruptcy Assets to SWJ, and its own interest in the sale proceeds.

20. At the time of the execution of the Escrow Agreement, I relied that Arent Fox would not accept Dare's $5 million if it knew that the underlying loan and purchase transaction were fraudulent.

21. I had no reason to believe that Arent Fox would violate any of its obligations founded upon the Escrow Agreement or upon its professional obligations or other legal requirements imposed upon it by law.

22.I did not conduct, nor did I have any reason to conduct, any independent investigation into Arent Fox's compliance with the laws and regulations governing its profession.

23.At the time of the execution of the Master Loan Agreement, Exhibit 1, and the Escrow Agreement, Exhibit 2, I was not aware, nor did I have reason to be aware, of the fraudulent nature of the BBG's.

24.I have since then learned that even prior to the execution of the Escrow Agreement, Arent Fox knew that the BBG's were fraudulent.

25.I learned this information on or after February 11, 2011.  At this time, I received a copy of a letter dated February 10, 2006, from Arent Fox's Thai counsel who advised Arent Fox that the BBG's were fraudulent. I also received a copy of Arent Fox's internal e-mail in which Arent Fox confirmed knowledge of the fraudulent nature of the BBG's, and in which Arent Fox admits making a conscious decision not to make disclosure until Dare funded Arent Fox's escrow account with $5 million. The e-mail from Mr. Grossman to Mr. Carter, both members of Arent Fox, states:

> I received a call from the attorney in Thailand that wrote this letter. He explained in greater detail what he believes we are dealing with. **Apparently this is not the first time BGs of this type have been used in an attempted fraud. The bank has in the past referred several similar situations to the Thai authorities for review.** He did not say these notes have been referred. He also told me that the bank said that the registration numbers are not in the form that they

6

would use for these types of guarantees. He believes we are dealing with worthless and fraudulent paper.

We should discuss how to bring this to the attention of the court and the authorities. Brody [Counsel for Creditor's Committee] believes that all of the parties affected by this may have claims against several parties including Proskauer [SWJ's law firm]. They argue that Dale [Schreiber, SWJ's lawyer] was either a knowing party to this fraud or was grossly negligent. They have also raised the question of if the estate has the rights of SWJ does SWJ have claims against [its lawyers] for representing SWJ and Cobra. Schreiber still argues that the Notes are authentic and that he can explain the responses from the bank. **Schreiber and Gordon Duval also insist that they will, prior to Wed fund a compromise proposal. Most BK judges will take the money, if offered and not involve themselves in the question of possible criminal acts by the non debtor. That is all I know at this time. The committee is fully aware of this. In fact they did their own analysis of whether to go to court or wait until Wed.** (emphasis supplied)

26. I wired $5 million into Arent Fox's escrow account on February 15, 2006 – 5 days after Arent Fox learned that the BBG's were fraudulent. February 15, 2006 is the "Wed" referenced in the 02-12-06 e-mail from Mr. Grossman to Mr. Carter.

27. Had I known that the BBG's were fraudulent, I never would have wired $5 million to Arent Fox. Instead, I would have concluded that the entire transaction was fraudulent and I would not have entered into the Dare – SWJ loan.

28. Had I known the remaining material information referenced above, I never would have wired $5 million to Arent Fox. Instead, I would have concluded

7

that the entire transaction was fraudulent and I would not have entered into the Dare – SWJ loan.

29. I now know that on March 9, 2006, the Court in the FCCG Bankruptcy entered Order (Doc 917) which modified Dare's security provision in the original Master Loan Agreement, Exhibit 1, by granting security in the BBG's to Debtor and taking it away from Dare.

30. On March 13, 2006, I executed an Amended Master Loan Agreement which appeared the same as the 02-14-06 Master Loan Agreement, except that the reference to my security interest in the BBG's was now deleted in order to comply with the Court Order. Exhibit 4.

31. SWJ subsequently breached its loan repayment obligations.

32. Dare was later sued by Lorraine and Peter Mocco.

33. In the context of the Mocco v. Dare litigation, I visited Peter Mocco in New Jersey on or about May 11, 2009. At this time, Mr. Mocco indicated that, in his opinion, the BBG's were fraudulent.

34. It was sometime after my meeting with Peter Mocco in May of 2009 that I developed a belief that that BBG's could in fact fraudulent.

35. In October of 2010, I retained my current counsel with respect to a claim against Chicago Title Insurance Company. The basis of this claim was the refusal of Chicago Title to indemnify Dare's losses arising out of a collateral

8

assignment of the Sayreville Mortgage which Dare took as security for the Dare – SWJ loan. See <u>Dare Investments v. Chicago Title</u>, US District Court for the District of New Jersey, cause number NO. 2:10-cv-06088-DRD-MAS.

36. As part of Dare's continuing due diligence in that case, I discovered that Arent Fox knew as of February 10, 2006, that the BBG's were fraudulent. Exhibit 3.

37. I did not receive actual information relating to Arent Fox's breaches of fiduciary duty sufficient to file a cause of action until February 11, 2011, when I received a copy of Arent Fox's internal communications regarding the fraud (Exhibit 3) from James Scarpone, Esq., a New Jersey attorney for Peter and Lorraine Mocco. (Declaration of Richard McCloskey)

38. Arent Fox kept Exhibit 3 "PRIVILEGED" and secret, as demonstrated by the "PRIVILEGED" designation of Exhibit 4 from Arent Fox's Hunter Carter to Ronald Chorches ("cho690@aol.com") dated January 24, 2007. Ronald Chorches was the Trustee in the Chapter 7 Bankruptcy of James Licata, whose case was consolidated into the FCCG Bankruptcy. (See, e.g., Doc 1197)

39. In its Brief, Arent Fox refers to Dare as an "investor". Dare was never an "investor"; Dare was a lender.

DATED this  13th  day of June, 2011.

Richard McCloskey

9

SUBSCRIBED AND SWORN TO before me this 13th day of June, 2011, by

Richard McCloskey.

Notary Public

DANIEL BRAITHWAITE
NOTARY PUBLIC-STATE OF UTAH
COMMISSION# 576152
COMM. EXP. 08-12-2012

10

**02-14-06 Master Loan Agreement**

**Exhibit 1**

## MASTER LOAN AGREEMENT

This master loan agreement, dated February 14, 2006, is between SWJ HOLDINGS, LLC, a _____ limited liability company ("SWJ"); STEPHEN PODELL ("Podell"), individually; COBRA/VENTURA EQUITIES, LLC, a New Jersey limited liability company ("Cobra"); WILLIAM J. MOURNES (Mournes"), individually; and DARE INVESTMENTS, LLC, a Utah limited liability company ("Dare").

### RECITALS

WHEREAS SWJ is a Delaware limited liability company that has certain contract rights pursuant to a First Amended Asset Purchase Agreement (Exhibit 1) to purchase certain assets of the bankruptcy estate in the consolidated First Connecticut Holding Group, LLC, cases (collectively, "Debtor"), presently in the US Bankruptcy Court, District of Connecticut, case numbers 02-50852, 02-51167, 0251176, and 02-51220 for a net purchase price of $10,850,000; and

WHEREAS Mr. Podell is the manager and a member of SWJ; and

WHEREAS Cobra is a New Jersey limited liability company that is a member of SWJ and also the beneficiary of the Bangkok Bank bank guarantee (Exhibit 2) which is to serve as additional collateral for this loan; and

WHEREAS Mr. Mournes is the manager and a member of Cobra; and

WHEREAS Dare is providing a hard money loan to allow for the acquisition of the assets identified in the asset purchase agreement (the "Assets");

THEREFORE IT IS AGREED AS FOLLOWS:

1.  **Payment on Behalf of SWJ.** No later than noon on February 15, 2006, Dare will pay on behalf of SWJ and Cobra $5,000,000 to the trust account of Arent Fox, counsel for the Debtor (the Disbursement"), for disbursement to the appropriate parties in the jointly administered bankruptcy cases, which advance shall constitute a loan to SWJ and Cobra that shall be evidenced by a promissory note in form reasonably acceptable to counsel for Dare (the "Note").

2.  **Note Terms.** The Note shall provide for a lump sum payment to Dare of $12,000,000 payable in full on or before Noon, MST, on December 15, 2006 (the "Maturity Date"). The Note will provide that it may be pre-paid at any time, without penalty. The Note shall further provide that if it is not paid in full by May 16, 2006, SWJ and Cobra agree to an additional consideration equal to 5% of the then-outstanding amount to be added to the principal balance, and an additional 5% shall be added to the principal balance each 180 days thereafter. The Note will further provide that after the Maturity Date, the unpaid principal balance will bear simple interest at the annual rate of 18%, until paid in full. Both SWJ and Cobra shall be makers

731899.2

1

of the Note, and they shall be jointly and severally liable for all obligations to Dare provided therein or in any of the Security Documents (as hereinafter defined).

3.      **Loan Collateral.** The Note shall be secured by a senior security interest in favor of Dare in all of the Assets, subject only to the relative priorities provided in the next succeeding section of this Agreement ("Dare's Security Interest"), and pursuant to such security agreements, collateral assignments, financing statements and other documents as counsel for Dare shall reasonably require.

4.      **Relative Priority of Dare Security Interest with Security Interest of Debtor's Creditors.** The $5,850,000 balance owed to the Debtor (the "Debtor Obligation") remaining after payment of the $5,000,000 by Dare pursuant to the February 2, 2006 court order in the bankruptcy cases shall be secured by a collateral assignment of the Assets (the "Creditors' Security Interest"). SWJ's agreement with the Debtor and its creditors shall provide that the Creditors' Security Interest shall be junior and subordinate to Dare's Security Interest until Dare has received payments on the obligation represented by the Note aggregating $6,000,000; after which the next $2,000,000 owed by SWJ and Cobra to Dare under the Note, and the first $2,000,000 owed to the Debtor on account of the Debtor Obligation, shall be secured by Dare's Security Interest and the Creditors' Security Interest, *in pari passu*; and thereafter the Creditor's Security Interest in the Assets will be senior to the Dare Security Interest until the Debtor Obligation is paid in full. SWJ's agreement with the Debtor and its creditors shall further provide that prior to the maturity date of the promissory note secured by the Creditors' Security Interest, the bankruptcy creditors may not foreclose without the prior, written consent of Dare.

5.      **Title to Assets.** Prior to granting Dare's Security Interest to Dare, SWJ shall acquire the Assets free and clear of all adverse liens, interests and encumbrances within the meaning of 11 U.S.C. Section 363, as provided in the February 2, 2006, bankruptcy court order.

6.      **Limitation on Transfer.** Until the Note has been paid in full, none of the Assets may be sold, transferred or otherwise encumbered without seven (7) days' prior written notice to Dare.

7.      **Releases.** The bankruptcy estate, SWJ and Cobra shall enter into reciprocal releases signed by all parties for all claims except those arising under the agreement to sell the Assets.

8.      **Conditioned Upon Delivery of Commitment to Issue Policy of Title Insurance.** All of Dare's obligations hereunder, and any disbursement of the Disbursement to the Debtor or its creditors, are expressly conditioned upon receipt, by Dare, of a commitment to issue a lender's policy of title insurance from Chicago Title Insurance Company, issued by its agent, Horizon Title Agency, in the amount of $5,500,000, with respect to the mortgagee's interest of First Connecticut Consulting Group, Inc. ("FCCG") under the Mortgage from Lorraine Mocco to FCCG, pledging Lot(s) 1 in Blocks 249, 250, and 251, as shown on the Tax Map of the Borough of Sayreville, New Jersey, which commitment shall be in a form acceptable to Dare.

731899.2                                    2

9.     **Conditioned upon Court Approval.** All of Dare's obligations hereunder, and any disbursement of the Disbursement to the Debtor or its creditors are expressly conditional on amendment of the February 2, 2006 bankruptcy court order and approval of the terms of this Agreement by a further final and non-appealable order.  SWJ's agreement with the Debtor shall provide that if the bankruptcy court rejects the proposed modification, the Disbursement funds shall be returned to Dare within 24 hours of such rejection.

10.     **Bangkok Bank Guarantee.** SWJ's agreement with the Debtor and its creditors shall provide for abandonment or redemption of the Debtors' claim on the Bangkok Bank bank guarantee upon disbursement of the Disbursement and the delivery of the appropriate security documents.  Cobra shall grant Dare a senior interest in the Bangkok Bank bank guarantee as additional collateral for the Note.  If the Note is not paid in full by May 16, 2006, Cobra consents to the grant of security interest in the bank guarantee in favor of a third-party lender to re-finance the Note and pay all obligations to Dare and hereby irrevocably appoints Dare as its attorney-in-fact for such purpose.

11.     **Loan Fee.** Dare acknowledges receipt of a $50,000 loan fee from SWJ and Cobra, which shall be additional consideration to Dare and to reimburse Dare for its professional fees incurred in connection with this transaction.

12.     **Transfer of Membership Interest in SWJ.** Upon closing of the purchase of the Assets from the Debtor, Cobra shall transfer 10% of its membership interest in SWJ to Dare, free and clear of all adverse interests, as additional consideration.  If the Note is not paid in full before May 16, 2006, then Cobra shall transfer an additional 5% of its membership interest to Dare, free and clear of all adverse interests.  If the Note is not paid within 180 days, then Cobra shall transfer an additional 5% interest to Dare, free and clear of all adverse interests..

13.     **Transfer of Membership Interest in Cobra.** Upon closing of the purchase of the Assets from the Debtor, William Mournes shall transfer 5% of his membership interest in Cobra to Dare, free and clear of all adverse interests.

14.     **Guarantee.** Any collateral provided for in this Agreement or the Security Documents shall also secure all existing obligations of Cobra to Dare.  Cobra acknowledges that the current balance on those existing obligations is $5,102,286.92.

15.     **Participation in Repayment to Utah Investors.** As a member of Cobra, Dare may participate in the negotiations regarding repayment of the debts owed to the Utah investors.

16.     **Entire Agreement.** This Agreement constitutes the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements and understandings written and oral, among the parties with respect to such subject matter.

731899.2                                    3

02/15/2006  14:32      9739840808                    RESIDENCE INN                        PAGE  10/10

02/15/2006 10:55 IFAX
FEB-15-2006 11:48  FROM:DARE INVESTMENTS 801-655-0656          * transfer         003/003
                                                              TD:18013200537      P:3/3

17.  **Utah Law Applicable.** This Agreement and any issue arising under or relating to it shall be construed under the laws of the state of Utah, without resort to its choice of laws or other conflicts of laws principles.

18.  **Attorneys Fees.** In the event of a default under this Agreement, the defaulting party shall pay all reasonable attorneys fees and costs incurred by the non-defaulting part(ies) to enforce his or its (as the case may be) rights and remedies under this Agreement.

19.  **Execution in Counterparts.** This Agreement may be executed in two or more counterparts, and shall be deemed to be fully executed when signed by all parties to the Agreement.

SWJ HOLDINGS, LLC

_____          _____
STEPHEN PODELL, managing member       STEPHEN PODELL, individually


COBRA/VENTURA EQUITIES, LLC

_____          _____
WILLIAM J. MOURNES, managing member   WILLIAM J. MOURNES, individually


DARE INVESTMENTS LLC

_____
Richard D. McCloskey, Jr., managing member


731899.2                              4

17.    **Utah Law Applicable.** This Agreement and any issue arising under or relating to it shall be construed under the laws of the state of Utah, without resort to its choice of laws or other conflicts of laws principles.

18.    **Attorneys Fees.** In the event of a default under this Agreement, the defaulting party shall pay all reasonable attorneys fees and costs incurred by the non-defaulting part(ies) to enforce his or its (as the case may be) rights and remedies under this Agreement.

19.    **Execution in Counterparts.** This Agreement may be executed in two or more counterparts, and shall be deemed to be fully executed when signed by all parties to the Agreement.

SWJ HOLDINGS, LLC

_____        _____
STEPHEN RODELL, managing member         STEPHEN RODELL, individually


COBRA/VENTURA EQUITIES, LLC


_____        _____
WILLIAM J. MOURNES, managing member     WILLIAM J. MOURNES, individually


DARE INVESTMENTS LLC

_____

# 02-14-06 Escrow Instructions

# Exhibit 2

## ESCROW AGREEMENT

This Escrow Agreement (this **"Agreement"**) is entered into as of the 14th day of February, 2006, by and among JAMES J. LICATA, FIRST CONNECTICUT CONSULTING GROUP, INC., FIRST CONNECTICUT HOLDING GROUP L.L.C. XXIII and FIRST CONNECTICUT HOLDING GROUP L.L.C. XXIV (collectively the **"Debtors"**), (together with the Debtors, collectively the **"Sellers** or, each individually a **"Seller"**), SWJ HOLDINGS, LLC (**"Purchaser"**), DARE INVESTMENTS, LLC, a Utah Limited Liability Company ("DARE") and COBRA/VENTURA EQUITIES LLC ("Cobra/Ventura") (collectively, the **"Parties"**) and ARENT FOX PLLC, as escrow agent (the **"Escrow Agent"**). Capitalized terms used in this Agreement and not otherwise defined shall have the meanings given to them in the Asset Purchase Agreement referred to below.

### RECITALS

WHEREAS, the Parties have entered into that certain First Amended Asset Purchase Agreement dated as of the Effective Date (the "FAAPA"), relating to the purchase and sale of Sellers' Assets; and

WHEREAS, pursuant to a certain Proposal from Cobra/Ventura dated February 14, 2006 (the "CV Proposal"), *inter alia*, the Purchaser is required to deliver the sum of five million dollars ($5,000,000.00) (the "Escrowed Funds") to the Escrow Agent under terms provided therein; and

WHEREAS, Dare Investments, LLC is providing the Escrowed Funds subject to court approval of the CV Proposal, will be lending the funds to the Purchaser, and that Cobra/Ventura will be guaranteeing payment and performance of the Purchaser's obligations under separate agreements between and among them; and

WHEREAS, the Parties desire and request that the Escrow Agent be engaged as agent to hold the Escrowed Funds, if necessary, in escrow and to distribute the Escrowed Funds in accordance with the terms and conditions hereof; and

WHEREAS, the Escrow Agent is willing to perform such services in accordance with the terms and conditions hereof; provided, that the Escrow Agent shall also continue to serve as Debtors' counsel.

NOW, THEREFORE, in consideration of the foregoing and of the agreements hereinafter set forth and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be bound, hereby agree as follows:

### TERMS

### SECTION 1. THE ESCROW AGENT'S DUTIES AND RESPONSIBILITIES

A.      The duties and responsibilities of the Escrow Agent, as escrow agent, shall be limited to those expressly set forth in this Agreement. No implied duties of the Escrow Agent

shall be read into this Agreement and the Escrow Agent shall not be subject to, or obliged to recognize any other agreement between, or direction or instruction of any or all the parties hereto even though reference thereto may be made herein, except to the extent expressly provided herein.

B.      Upon receipt by the Escrow Agent of any Escrowed Funds from Purchaser in accordance with the instructions attached as Exhibit A to this Agreement, the Escrow Agent shall promptly notify Sellers that the Escrow Agent has received the Escrow Fund and is holding same pursuant to this Agreement. Upon receipt of any Escrowed Funds, Escrow Agent shall deposit same in an interest-bearing deposit account to be maintained by Escrow Agent (which need not be a segregated account, but may be a sub-account) at North Fork Bank or at any other bank or trust company organized in the United States having a minimum net worth of $200 million.  The Escrowed Funds, which shall include any and all interest accrued thereon, shall be disbursed in accordance with the terms and subject to the conditions of this Agreement.

C.      Within three (3) business days after  receipt of written notice from the Parties to the Escrow Agent (the **"Disbursement Notice"**), the Escrow Agent shall release all of the Escrowed Funds from escrow and disburse such Escrowed Funds to such persons, in such amount and in such manner as shall be reasonably directed in the Disbursement Notice.  If the Parties have not given the Disbursement Notice on or before March 31, 2006, then the Escrow Agent shall apply to the U.S. Bankruptcy Court for the District of Connecticut (the "Court") for deposit of the Escrowed Funds, and, upon approval of such application, shall deposit the Escrowed Funds with the Court. The Parties shall support any such application of the Escrow Agent.

D.      Notwithstanding anything to the contrary provided in this Agreement, unless otherwise agreed upon in writing by the Parties, the Escrow Agent shall return the Escrow Funds to Dare in the event that, on or before March 31, 2006, (i) the CV Proposal is not approved by the Court or (ii), unless prevented by the fault of the Purchaser, closing has not occurred under the terms of the FAAPA.  In such event, the Escrow Agent shall continue his duties and not be discharged for a reasonable time, but in no event shall such reasonable time exceed five business days..

E.      The Escrow Agent is authorized, in its sole and absolute discretion, to disregard any and all notices or instructions other than the Disbursement Notice.  Notwithstanding anything to the contrary in this Agreement, Escrow Agent is hereby authorized to comply, and shall comply, with any order of the Court or any other court which the Escrow Agent, in its sole and absolute discretion, determines has jurisdiction over it or the Escrowed Funds.

F.      The Escrow Agent may rely, and shall be protected in acting or refraining from acting, upon any instrument furnished to it hereunder and believed by it, in its sole and absolute discretion, to be genuine and believed by it to have been signed or presented by the appropriate parties. The Escrow Agent may assume that the persons purporting to give any notice or instructions in accordance with the provisions hereof have been duly authorized to do so.

G.      The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that the Escrow Agent's gross negligence or willful misconduct was the primary cause of any loss to the Purchaser or the Sellers.

2

H.      The Escrow Agent shall not be responsible or liable in any respect on account of the identity, authority or rights of any person executing, depositing or delivering or purporting to execute, this Agreement or on account of or by reason of forgeries, false representations by third parties. Under no circumstances shall the Escrow Agent be liable for any general or consequential damages or damages caused, in whole or in part, by the action or inaction of the Parties or any of their respective agents or employees, whatsoever, and its sole obligation shall be to deliver the Escrowed Funds as required hereunder or to resign as permitted hereunder. The Escrow Agent shall not be liable for any damage, loss, liability, or delay caused by accident, strike, fire, flood, war, riot, equipment breakdown, electrical or mechanical failure, act of God or any cause which is reasonably unavoidable or beyond its reasonable control.

I.      The Escrow Agent may consult with legal counsel of its own choosing (including, without limitation, lawyers that are members of, or employed by, Escrow Agent) and shall be fully protected in acting or refraining from acting in good faith and in accordance with the opinion of such counsel.

J.      The Escrow Agent shall not have any liability arising out of or relating to losses resulting from its investment or reinvestment of the Escrowed Funds, including, but not limited to, any loss of or failure to earn interest on the Escrowed Funds, any claim that a higher rate of return could have been obtained, or any loss of interest resulting from any delay in the investment or reinvestment of the Escrow Deposit or the repurchase or sale of any certificate of deposit. The Escrow Agent shall be entitled to rely upon any judgment, notice, instrument or other writing delivered to it under this Agreement without being required to determine the authenticity of, or the correctness of any fact stated in, that document. The Escrow Agent may act in reliance upon any instrument or signature believed by it to be genuine and may assume that any person purporting to give any notice or receipt or advice or to make any statement or execute any document in connection with this agreement has been duly authorized to do so. The Escrow Agent shall have no duties or responsibilities except those expressly set forth in this agreement. The Escrow Agent shall not have any obligations arising out of or be bound by the provisions of any other agreement, written or oral, including, but not limited to, the Agreement.

K.      The Escrow Agent shall not be responsible in any manner whatsoever for: (a) any failure or inability of the Parties, or of anyone else, to perform or comply with any of the provisions of this Agreement or the FAAPA; (b) any misconduct or inability to perform with respect to the Escrowed Funds or the failure to return all or any part of the Escrowed Funds by any financial institution in which any Escrowed Funds are deposited or maintained; or (c) any investment decision with respect to the Escrowed Funds within the authority of the Escrow Agent expressly provided under this Agreement. Furthermore, the Escrow Agent shall not be responsible for the collection of any checks deposited with it.

L.      The Escrow Agent shall not be bound or in any way affected by any notice of any modification or cancellation of this Escrow Agreement by the Parties in which the Escrow Agent does not join, or of any fact or circumstance affecting or alleged to affect rights or liabilities hereunder other than as is expressly provided in this Agreement, or affecting or alleged to affect the rights and liabilities of any other person, unless notice of the same is delivered to the Escrow Agent in writing, signed by the proper parties to the Escrow Agent's satisfaction and, in the case of

3

modification, unless such modification shall be satisfactory to the Escrow Agent and approved by the Escrow Agent in writing.

M.    Notwithstanding anything to the contrary contained in this Agreement, the Parties agree that the Escrow Agent may represent the Debtors (and/or any of their affiliates) as counsel in any action, suit or other proceeding between the Parties, including, without limiting the generality of the foregoing, any action, suit or other proceeding brought to recover the Escrowed Funds, it being acknowledged by the Parties that the duties of the Escrow Agent hereunder are intended to be solely ministerial in nature and will not cause the Escrow Agent to be required to take a position, as escrow agent, adverse to any party hereto or disqualify it from representing the Debtors in any capacity deemed appropriate by the Escrow Agent so long as Escrow Agent acts consistently with its duties under this Agreement.

## SECTION 2. FEES AND EXPENSES OF THE ESCROW AGENT.

The Escrow Agent shall serve without compensation, subject to the provisions of Section 3, below.

## SECTION 3. INDEMNIFICATION OF THE ESCROW AGENT.

In addition to any other indemnity provided for in this Agreement, the Escrow Agent shall not be liable for, and the Parties hereby jointly and severally agree to reimburse Escrow Agent for, and to indemnify and agree to save harmless the Escrow Agent of and from, all loss, cost, liability, damage and expense, including without limitation, counsel fees (either paid to retained attorneys and/or members or employee of Escrow Agent (at rates customarily charged to clients)), incurred or suffered by Escrow Agent, arising out of or relating in any way to this Agreement, including, without limitation, those arising out of any dispute under this Escrow Agreement or otherwise with respect to all or any portion of the Escrowed Funds, including, without limitation, the costs and expenses of defending itself against any claim arising hereunder unless the same are caused by the willful, bad faith misconduct or gross negligence of the Escrow Agent. This indemnification and reimbursement obligation shall survive the release, discharge, termination, and/or satisfaction of this Agreement.

## SECTION 4. RESIGNATION OF ESCROW AGENT.

(a)    The Escrow Agent and any successor escrow agent, as the case may be, may resign its duties and be discharged from all further duties or obligations hereunder at any time upon giving five (5) days' written notice to the Parties. The Parties will thereupon jointly designate a successor escrow agent hereunder within said five (5) day period to whom the Escrowed Funds shall be delivered or assigned. In default of such a designation of a successor escrow agent, the Escrow Agent shall retain the Escrowed Funds as custodian thereof until otherwise jointly directed by the Parties or until it has released the Escrowed Funds as otherwise provided in this Agreement, in each case without liability or responsibility.

(b)    Anything in this Escrow Agreement to the contrary notwithstanding, the Escrow Agent, at any time on notice to the Parties, may take such other steps as the Escrow Agent, at

4

its option (in its sole and absolute discretion), may elect in order to terminate its duties as escrow agent hereunder, including, but not limited to, the deposit of the Escrowed Funds with the Court. Following deposit of all such Escrows Funds with the Court, the Escrow Agent shall be entitled to be relieved and discharged from any liability or responsibility to the parties hereto. Except as otherwise expressly provided by this Agreement, the Escrow Agent shall not be under any obligations to take any legal action in connection with this Agreement or its enforcement or to appear in, prosecute or defend any action or legal proceeding which, in its opinion, would or might involve it in any cost, expense, loss or liability, unless, and as often as required by it, it shall be furnished with security and indemnity satisfactory to it against all such costs, expenses (including attorneys' fees), losses and liabilities.

## SECTION 5. NOTICES.

Any notice, demand, approvals and other communications sent pursuant to this Agreement shall be in writing and shall be delivered by personal service, overnight air courier, or by facsimile, with confirmed transmission report, and addressed to the appropriate party at its address as follows:

(a)    If to Sellers:

James J. Licata
23 Meeting House Road
Greenwich, Connecticut  06831

With a copy to:
Arent Fox PLLC
1675 Broadway
New York, New York 10019
Attention:  Robert E. Grossman, Esq.
Facsimile:  212-484-3990

(b)    If to the Purchaser:

SWJ Holdings, LLC
c/o Blackhawk Partners, LLC
11 West 42nd Street
New York, New York  10036
Attention:  Steven Podell, Esq.

With a copy to:

Proskauer Rose LLP
1585 Broadway
New York, New York  10036
Attention:  Dale A. Schreiber, Esq.
Facsimile:  212-969-2900

5

(c)    If to the Escrow Agent:

Arent Fox PLLC
1675 Broadway
New York, New York 10019
Attention:  Robert E. Grossman, Esq.
Telefacsimile: (212) 484-3990

(d)    If to Rick McCloskey and/or Cobra/Ventura Equities LLC:

Duval Haws & Moody, P.C.
947 South 500 East, Suite 200
American Fork, Utah 84003
Attention: Gordon Duval, Esq.
Facsimile: 801-763-8379

(e)    If to Dare Investments, LLC:

Jones, Waldo, Holbrook & McDonought, PC
170 South Main Street
Suite 1500
Salt Lake City, Utah 84101-1644
Attention: George Pratt, Esq.
Facsimile: (801) 328-0537

Addresses for notice may be changed from time to time by written notice to the other parties.  Any communication will be effective (i) if given by personal delivery or by overnight air courier, when delivered to the appropriate address above set forth, and (ii) if given by facsimile transmission, when transmitted to the appropriate fax number above set forth, with a faxed confirmation obtained by sender.

### SECTION 6.  ENTIRE AGREEMENT.

This Agreement constitutes the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements and understandings written and oral, among the parties with respect to such subject matter; provided, however, that nothing herein shall be construed to alter the obligations of the Parties under the Asset Purchase Agreement.

### SECTION 7.  MODIFICATION.

None of the terms or conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever unless in a writing duly signed by all the Party or Parties or the Escrow Agent, as the case may be, to be charged therewith.

6

## SECTION 8.  ENFORCEABILITY.

A.      Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

B.      This Agreement shall be binding upon, and inure to the benefit of, and be enforceable by and against the respective successors and assigns of the parties to this Agreement.

C.      This Agreement shall be construed, enforced and administered in accordance with the laws of the State of New York, applicable to contracts executed, delivered and to be fully performed in New York, regardless of where actually executed, delivered or performed and notwithstanding any contrary choice or conflict of law provisions.

## SECTION 9.  HEADINGS DESCRIPTIVE.

The headings of the several sections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

## SECTION 10.  EXECUTION IN COUNTERPARTS.

This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all of which shall together constitute one and the same instrument.  Signatures sent by telefacsimile transmission shall be deemed to be originals.

7

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed as of the date first above written.

SWJ HOLDINGS, LLC                      COBRA/VENTURA EQUITIES LLC

By: _____           By: _____
    Name: Stephen Podell                   Name: William J. Mournes
    Title:  Managing Member                Title:  Managing Member

DARE INVESTMENTS, LLC                  ARENT FOX PLLC,
                                       as Escrow Agent

By: _____           By: _____
    Name:  Rick McCloskey                  Name  Robert E. Grossman
    Title:   Managing Member               Title:  Member

ACKNOWLEDGED AND AGREED TO

OFFICIAL COMMITTEES OF UNSECURED CREDITORS

By: _____
    Alan J. Brody
    Buchanan Ingersoll PC

8

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed as of the date first above written.

SWJ HOLDINGS, LLC

By: _____
Name: Stephen Podell
Title:  Managing Member

COBRA/VENTURA EQUITIES LLC

By: _____
Name: William J. Mournes
Title:  Managing Member

DARE INVESTMENTS, LLC

By: _____
Name: Rick McCloskey
Title:   Managing Member

ARENT FOX PLLC,
as Escrow Agent

By: _____
Name  Robert E. Grossman
Title:  Member

ACKNOWLEDGED AND AGREED TO

OFFICIAL COMMITTEES OF UNSECURED CREDITORS

By: _____
Alan J. Brody
Buchanan Ingersoll PC

8

**02-11-11 E-Mail From James Scarpone**

# Exhibit 3

Subj:    **Mocco v. Licata, et al.**
Date:    2/11/2011 2:37:14 P.M. US Mountain Standard Time
From:    calt@scarponevargo.com
To:      strojnik@aol.com
CC:      jscarpone@scarponevargo.com
Mr. Strojnik:

Please see attached from Jim Scarpone.

Clare


Clare M. Alt
Scarpone & Vargo LLC
50 Park Place, Suite 1003
Newark, New Jersey 07102
973.623.4101 x306
973.623.4181 (fax)

Confidentiality Notice: This e-mail contains confidential or privileged information from the law firm of Scarpone & Vargo LLC.  Dissemination, distribution or copying of this e-mail or the information contained within it by anyone other than the intended recipient is prohibited. If you have received this e-mail in error, please call Scarpone & Vargo LLC at 973.623.4101 and destroy the original e-mail and all copies.

Banking/Financial Transaction in Thailand

Subj:   FW: Banking/Financial Transaction in Thailand -- PRIVILEGED
Date:   1/24/2007 5:35:20 P.M. Eastern Standard Time
From:   Carter.Hunter@Arentfox.com
To:     Cho690@aol.com

Ron,

You recently requested that we furnish a copy of any documentation we had concerning the validity of the "Bank Guaranty" that was given in security for the purchase by SWJ of the various estates' assets.

I am forwarding a copy of a letter that was obtained from Thai counsel by our firm (acting as Debtor's counsel) and an email, relating to that letter, that was written by our former colleague, Robert Grossman. Bob summarizes a conversation with Thai counsel, as well as responses from SWJ's counsel and some information from Committee counsel.

There are numerous other emails internally at AF and between AF and various entities generally relating to the bank guaranties over the course of several months. Please give me a call to discuss what else you would like us to provide and to narrow the focus of your inquiry so that we can find what it is that you need.

Thanks,

Hunter

---

From: Grossman, Robert
Sent: Sunday, February 12, 2006 1:29 PM
To: Carter, Hunter T.; Silkenat, James
Subject: FW: Banking/Financial Transaction in Thailand

I received a call from the attorney in Thailand that wrote this letter. He explained in greater detail what he believes we are dealing with. Apparently this is not the first time BGs of this type have been used in an attempted fraud. The bank has in the past referred several similar situations to the Thai authorities for review. He did not say these notes have been referred. He also told me that the bank said that the registration numbers are not in the form that they would use for these type of guarantees. He believes we are dealing with worthless and fraudulent paper.

We should discuss how to bring this to the attention of the court and the authorities. Brody believes that all of the parties effected by this may have claims against several parties including Proskauer. They argue that Dale was either a knowing party to this fraud or was grossly negligent. They have also raised the question of if the estate has the rights of SWJ does SWJ have claims against Proskauer for representing SWJ and Cobra. Schreiber still argues that the Notes are authentic and that he can explain the response of the bank. Schreiber and Gordon Duval also insist that they will, prior to Wed fund a compromise p oposal. Most BK judges will take the money, if offered and not involve themselves in the question of possible criminal acts by the non debtor. That is all I know at this time. The committee is fully aware of this. In fact they did their own analysis of whether to go to the court or wait until Wed.

---

From: Jessada Sawatdipong [mailto:jessada@ctlo.com]
Sent: Fri 2/10/2006 5:16 AM
To: Grossman, Robert
Cc: Albert T. Chandler
Subject: Banking/Financial Transaction in Thailand

10 February 2006

To:   Robert Grossman <grossman.robert@arentfox.com>
      Arent Fox

Banking/Financial Transaction in Thailand

Please see attached.

Attachment:  k:\ch_data\JS\Misc\AF-021006.pdf

CHANDLER and THONG-EK LAW OFFICES LIMITED
7th-9th Floor, Bubhajit Building,
20 North Sathon Road
BANGKOK 10500
THAILAND
Tel: (662) 266-6485
Fax: (662) 266-6483
Website:www.ctlo.com

This e-mail message is CONFIDENTIAL and may contain legally privileged
information. If you are not the intended recipient you should not read,
copy, distribute, disclose or otherwise use the information in this
e-mail. Please also telephone or fax us immediately and delete the
message from your system. E-mail may be susceptible to data corruption,
interception and unauthorized amendment, and we do not accept liability
for any such corruption, interception or amendment or the consequences
thereof.

IRS Circular 230 disclosure:
To ensure compliance with requirements imposed by the IRS, we inform you that, unless expressly stated
otherwise, any U.S. federal tax advice contained in this communication (including any attachments) is not
intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal
Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter
addressed herein.

บริษัท ที่ปรึกษากฎหมายแชนด์เล่อร์และทองเอก จำกัด

## CHANDLER and THONG-EK
### LAW OFFICES LIMITED

7th – 9th Floor, Bubhajit Building
20 North Sathorn Road
Bangkok 10500, Thailand
E-mail: atchandler@otio.com

Phone  :  (662) 266-6485 thru 6510
Fax 63  :  (662) 266-6483
Fax 64  :  (662) 200-0140
Website  :  http://otio.com

10 February 2006

Fax:    1 212 484 3990

Robert Grossman
Arent Fox
Attorneys a Law
New York, USA

Re:    Banking/Financial Transaction in Thailand

We refer to your e-mail correspondence and telephone conversation with Mr. Chandler last night.

We have contacted Bangkok Bank Public Company Limited, Head Office, in Bangkok this morning regarding the Bank Guarantees attached to your e-mail to Mr. Chandler last night.

We were verbally informed that:

1. There is no record of those Bank Guarantees issued by Bangkok Bank Public Company Limited on that date.

2. Mr. Prasong Uthaisangchai is a director of Bangkok Bank Public Company Limited. He does not sign bank guarantees issued by Bangkok Bank Public Company.

3. Mr. Somchai Pongadulyasook was an officer of Bangkok Bank Public Company Limited. He retired some years ago.

4. Bangkok Bank Public Company Limited does not affix a seal in bank guarantees issued by it.

Please call me at my office at 66 2266 6485 ext. 153 or my mobile number at 66 9810 2468 in case you have any further question.

Best regards,

Jessada Sawatdipong

K:\Ch_dom\US\LTR\AF-021006.doc

# 03-13-06 Amended and Restated Master Loan Agreement

# Exhibit 4

# AMENDED AND RESTATED MASTER LOAN AGREEMENT

This Amended and Restated Master Loan Agreement, dated March 13, 2006, is between SWJ HOLDINGS, LLC, a Delaware limited liability company ("SWJ"); STEPHEN PODELL ("Podell"), individually; COBRA/VENTURA EQUITIES, LLC, a New Jersey limited liability company ("Cobra"); WILLIAM J. MOURNES (Mournes"), individually; and DARE INVESTMENTS, LLC, a Utah limited liability company ("Dare").

## RECITALS

WHEREAS SWJ is a Delaware limited liability company that has certain contract rights pursuant to a First Amended Asset Purchase Agreement (the "Asset Purchase Agreement") to purchase certain assets of the bankruptcy estate in the consolidated First Connecticut Holding Group, LLC, cases (collectively, "Debtor"), presently in the US Bankruptcy Court, District of Connecticut, case numbers 02-50852, 02-51167, 0251176, and 02-51220 for a net purchase price of $10,850,000 (after application of $400,000 previously paid by to Debtor); and

WHEREAS Mr. Podell is the manager and a member of SWJ; and

WHEREAS Cobra is a New Jersey limited liability company that is a member of SWJ; and

WHEREAS Mr. Mournes is the manager and a member of Cobra; and

WHEREAS Dare is providing a hard money loan to allow for the acquisition of the assets identified in the Asset Purchase Agreement (the "Assets"); and

WHEREAS the parties previously, on February 14, 2006, entered into a certain Master Loan Agreement; and

WHEREAS on March 9, 2006 the bankruptcy court entered an Order approving the sale of assets to SWJ, pursuant to the terms of the Asset Purchase Agreement (the "Order"); and

WHEREAS based on certain events that have taken place since February 14, 2006, the parties now wish to enter into this Amended and Restated Master Loan Agreement replacing and restating the Master Loan Agreement.

THEREFORE IT IS AGREED AS FOLLOWS:

1.    **Payment on Behalf of SWJ**. On February 15, 2006, Dare paid on behalf of SWJ and Cobra $5,000,000 to the trust account of Arent Fox, counsel for the Debtor (the "Disbursement"), for disbursement to the appropriate parties in the jointly administered bankruptcy cases, which advance shall constitute a loan to SWJ and Cobra that shall be

731899.35

evidenced by a promissory note in form reasonably acceptable to counsel for Dare (the "Note"). Dare acknowledges that the application of the $5,000,000 held by Arent Fox to the Purchase Price at the closing pursuant to the FAAPA and in accordance with the March 9, 2006 order of the Bankruptcy Court, shall not be a violation of any provision of this Agreement and all conditions precedent to such application under the Amended and Restated Master Loan Agreement have been satisfied.

2.      **Note Terms.**  The Note shall provide for a lump sum payment to Dare of $12,000,000 payable in full on or before Noon, MST, on December 15, 2006 (the "Maturity Date").  The Note will provide that it may be pre-paid at any time, without penalty.  The Note shall further provide that if it is not paid in full by May 16, 2006, SWJ and Cobra agree to an additional consideration equal to 5% of the then-outstanding amount to be added to the principal balance, and an additional 5% shall be added to the principal balance each 180 days thereafter. The Note will further provide that after the Maturity Date, the unpaid principal balance will bear simple interest at the annual rate of 18%, until paid in full.  Both SWJ and Cobra shall be makers of the Note.

3.      **Loan Collateral.**  The Note shall be secured by a senior security interest in favor of Dare in all of the Assets, subject only to the relative priorities provided in the next succeeding section of this Agreement ("Dare's Security Interest"), and pursuant to such security agreements, collateral assignments, financing statements and other documents as counsel for Dare shall reasonably require.

4.      **Relative Priority of Dare Security Interest with Security Interest of Debtor's Creditors.**  The $5,850,000 balance owed to the Debtor (the "Debtor Obligation") remaining after payment of the $5,000,000 advanced by Dare pursuant to the February 2, 2006, court order in the bankruptcy cases shall be secured by a collateral assignment of the Assets (the "Creditors' Security Interest").  SWJ's agreement with the Debtor and its creditors shall provide that for the first $6,000,000 owed under the Note, Dare's Security Interest in the Assets shall be in a first lien position; for the first $2,000,000 owed on the Debtor Obligation, the Creditors' Security Interest shall be in a second lien position; for the next $2,000,000 owed on the Note (after the payment of the $6,000,000 under the Note as provided previously), Dare's Security Interest in the Assets shall be in a third lien position; for the remaining balance owed on the Debtor Obligation (after payment of the first $2,000,000 on the Debtor Obligation as provided for above), the Creditors' Security Interest in the Assets shall be in a fourth lien position; and for the remaining balance owed on the Note, Dare's Security Interest in the Assets shall be in a fifth lien position, until the Note is paid in full.  SWJ's agreement with the Debtor and its creditors shall further provide that prior to the maturity date of the promissory note secured by the Creditors' Security Interest, the bankruptcy creditors may not foreclose without the prior written consent of Dare.

5.      **Title to Assets.**  Prior to granting Dare's Security Interest to Dare, SWJ shall acquire the Assets free and clear of all adverse liens, interests and encumbrances within the meaning of 11 U.S.C. Section 363, as provided in the February 2, 2006, bankruptcy court order.

731899.35

2

6.      **Limitation on Transfer.** Until the Note has been paid in full, none of the Assets may be sold, transferred or otherwise encumbered without seven (7) days' prior written notice to Dare.

7.      **Releases.** Upon Full Payment (as defined in the Order), the bankruptcy estate, SWJ and Cobra shall enter into reciprocal releases signed by all parties for all claims except those arising under the agreement to sell the Assets.

8.      **Conditioned Upon Delivery of Commitment to Issue Policy of Title Insurance.** All of Dare's obligations hereunder, and any disbursement of the Disbursement to the Debtor or its creditors, are expressly conditioned upon receipt, by Dare, of a commitment to issue a lender's policy of title insurance from Chicago Title Insurance Company, issued by its agent, Horizon Title Agency, in the amount of $5,500,000, with respect to the mortgagee's interest of First Connecticut Consulting Group, Inc. ("FCCG") under the Mortgage from Lorraine Mocco to FCCG, pledging Lot(s) 1 in Blocks 249, 250, and 251, as shown on the Tax Map of the Borough of Sayreville, New Jersey, which commitment shall be in a form acceptable to Dare.

9.      **Conditioned upon Court Approval.** All of Dare's obligations hereunder, and any disbursement of the Disbursement to the Debtor or its creditors are expressly conditional on amendment of the February 2, 2006, bankruptcy court order and approval of the terms of this Agreement by a further final and non-appealable order. SWJ's agreement with the Debtor shall provide that if the bankruptcy court rejects the proposed modification, the Disbursement funds shall be returned to Dare within 24 hours of such rejection.

10.     **Loan Fee.** Dare acknowledges receipt of a $50,000 loan fee from SWJ and Cobra, which shall be additional consideration to Dare and to reimburse Dare for its professional fees incurred in connection with this transaction.

11.     **Transfer of Membership Interest in SWJ.** Upon closing of the purchase of the Assets from the Debtor, Cobra shall transfer 10% of its membership interest in SWJ to Dare, free and clear of all adverse interests, as additional consideration. If the Note is not paid in full before May 16, 2006, then Cobra shall transfer an additional 5% of its membership interest to Dare, free and clear of all adverse interests. If the Note is not paid within 180 days, then Cobra shall transfer an additional 5% interest to Dare, free and clear of all adverse interests.

12.     **Transfer of Membership Interest in Cobra.** Upon closing of the purchase of the Assets from the Debtor, Mournes shall transfer 5% of his membership interest in Cobra to Dare, free and clear of all adverse interests.

13.     **Guarantee.** The Assets which will be conveyed to secure the Note, as provided for in this Agreement, shall also secure all existing obligations of Cobra to Dare (the "Cobra Obligations"). Cobra acknowledges that the balance on those obligations, as of February 27, 2006, is $5,172,224.89, and that interest continues to accrue on those obligations at the rate of $2,198.63 per day. SWJ shall enter into a security agreement with Dare conveying to Dare a security interest in all the Assets (which shall be junior to the security interests described in

3

paragraph 4 above, securing the Debtor Obligation and the Note). Further, following his outright transfer to Dare of a 5% interest (as provided for in paragraph 12 above), Mournes shall convey to Dare a security interest in his entire membership interest in Cobra to secure both the Note and the Cobra Obligations.

16. **Participation in Repayment to Utah Investors.** As a member of Cobra, Dare may participate in the negotiations regarding repayment of the debts owed to the Utah investors.

15. **Entire Agreement.** This Agreement constitutes the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements and understandings written and oral, among the parties with respect to such subject matter.

16. **Utah Law Applicable.** This Agreement and any issue arising under or relating to it shall be construed under the laws of the state of Utah, without resort to its choice of laws or other conflicts of laws principles.

17. **Attorneys Fees.** In the event of a default under this Agreement, the defaulting party shall pay all reasonable attorneys fees and costs incurred by the non-defaulting part(ies) to enforce his or its (as the case may be) rights and remedies under this Agreement.

18. **Execution in Counterparts.** This Agreement may be executed in two or more counterparts, and shall be deemed to be fully executed when signed by all parties to the Agreement.

SWJ HOLDINGS, LLC


_____
STEPHEN PODELL, managing member


_____
STEPHEN PODELL, individually


COBRA/VENTURA EQUITIES, LLC


_____
WILLIAM J. MOURNES, managing member


_____
WILLIAM J. MOURNES, individually


DARE INVESTMENTS, LLC


731899.35                                           4

Richard D. McCloskey, Jr., managing member