JUDGE KOELTL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**09 CIV 2157**

------------------------------------------------------------------X

RICHARD M. COAN, Chapter 7 Trustee
Of First Connecticut Consulting Group, Inc.,
and RONALD I. CHORCHES, Chapter 7
Trustee of James J. Licata,

                   Plaintiffs,

        -against-

ARENT FOX , PLLC, and
BUCHANAN INGERSOLL
& ROONEY, PC,

                  Defendants.

**VERIFIED
COMPLAINT**

**JURY   TRIAL
DEMANDED**

------------------------------------------------------------------X

      Plaintiff, **RICHARD M. COAN**, Chapter 7 Trustee of **First Connecticut Consulting Group, Inc.**, Debtor in the United States Bankruptcy Court, District of Connecticut, Case No. 02-50852 and Ronald I. Chorches, Chapter 7 Trustee of **James J. Licata**, Debtor, Case No. 02-51167 in the United States Bankruptcy Court,District of Connecticut by attorney **ANDREW LAVOOTT BLUESTONE**, as and for a verified complaint against Defendants ARENT FOX PLLC, and BUCHANAN INGERSOLL & ROONEY PC, complaining of the Defendants alleges and shows to the Court as follows:

## NATURE OF THE ACTION

1.    This is an action for legal malpractice in tort, in contract and pursuant to New

York Judiciary Law § 487.

## SUBJECT MATTER JURISDICTION

2.      The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(a)(1) and 1334.

3.      There is complete diversity of citizenship between Plaintiff and Defendants pursuant to 28 U.S.C. § 1331, *et seq.* and more than $ 75,000 in controversy.

4.      This action arises under, and relates to a case under the United States Bankruptcy Code, 11 U.S.C. §101 *et seq.*

5.      This matter arises subject to jurisdiction in the State of New York and under the substantive laws of the State of New York and consists of claims in tort, breach of contract and violations of New York Judiciary Law § 487 committed within the State of New York by Citizens of the State of New York.

6.      Venue is proper in this Court under 28 U.S.C. § 1391(a) and 1409.  The transactions from which this legal malpractice action arises took place in this district. The Southern District of New York is the judicial district in which a majority of the events and omissions giving rise to the claims occurred. Defendants are subject to jurisdiction within this District.

7.      Defendant ARENT FOX PLLC [hereinafter, "Arent Fox"] is a Professional Limited Liability Company which practices law within the Southern District of New

and maintains its principal office for the practice of law at 1675 Broadway, New York, New York, 10010.

8.    Defendant BUCHANAN, INGERSOLL & ROONEY PC [hereinafter, "Buchanan, Ingersoll"] is a Professional Corporation which practices law within the Southern District of New and maintains its principal office for the practice of law at 1 Chase Manhattan Plaza, New York, New York, 10005 and at 799 Alexander Road, Princeton, NJ 10105.

## THE PARTIES AND OTHER RELATED ENTITIES

9.    There are two bankruptcy cases involved herein. The first is: *In re: FIRST CONNECTICUT CONSULTING GROUP, Inc.,* Case No. 02-50852 in the United States Bankruptcy Court, District of Connecticut. ["FCCG Bankruptcy Case."]

10.    The second case is: *In re: JAMES J. LICATA,* Case No. 02-51167, also in the United States Bankruptcy Court, District of Connecticut.. ["Licata Bankruptcy Case."].

11.    Plaintiff Richard M. Coan is the Chapter 7 Trustee in the FCCG Bankruptcy Case.    Plaintiff Ronald I. Chorches is the Chapter 7 Trustee of the Licata Bankruptcy Case.

12.     Defendant Arent Fox represented debtor First Connecticut Consulting Group, Inc [hereinafter "FCCG"] and James J. Licata [hereinafter "Licata"] in their respective bankruptcy cases. [FCCG and Licata referred to together herein as the "Debtors."]

13.     Buchanan Ingersoll represented the duly appointed Official Committee of Unsecured Creditors ["Committee"] as its attorney in both Bankruptcy Cases.

14.     FCCG was a Connecticut corporation with a principal office at 301 Merritt, 7 Corporate Park, Norwalk Connecticut, 06851.  It was alleged to be controlled by James Licata, and upon information and belief, was jointly owned by James Licata and Cynthia Licata.

15.     James J. Licata ["Licata"] is a natural person, residing in Florida and Connecticut.

16.     Cynthia Licata is a natural person, residing in Florida and Connecticut.

17.     FCCG is a debtor in liquidation in the FCCG Bankruptcy Case.

18.     Licata is a debtor in liquidation in the Licata Bankruptcy Case.

19.     SWJ Holdings LLC ("SWJ") is a Delaware limited liability company having its principal place of business at 219 East 69th Street, New York, New York.

20.     Cobra/Ventura Equities LLC ["Cobra"]is a New Jersey limited liability company with business offices c/o William Mournes. 35 Bird Run Avenue,

Denville, New Jersey 07834.  Cobra, upon information and belief, is a member of SWJ.

21.     Dare Investments LLC  ["Dare"] is a Utah limited liability company.


## SUMMARY OF THE ACTION

### Allegations in the Complaint

22.     On September 30, 2002 FCCG filed a chapter 11 petition commencing the FCCG Bankruptcy Case.

23.     On June 21, 2002 Licata filed a chapter 11 petition commencing the Licata Bankruptcy Case.

24.     Arent Fox was retained as attorney for FCCG and Licata as debtors-in-possession, and entered an appearance in the Bankruptcy Cases.

25.     A Committee of Creditors [the "Committee"] was formed upon the United States Trustee's appointment on August 3, 2002.

26.     Defendant Buchanan Ingersoll became attorney for the Committee.

27.     In the FCCG case, the debtor's estate consisted of, *inter alia,* a group of assets [the "Assets"] which, eventually became subject to sale by auction, as more fully described herein.

28.     On March 11, 2005 the Debtors filed a motion for permission to sell

substantially all of their assets (the "March Sale Motion") based upon a non-binding term sheet ["term sheet"] executed by SWJ, a purported purchaser pursuant to an as yet undrafted Asset Purchase Agreement ["APA"]. Pursuant to the March Sale Motion, the Debtors were to sell certain assets, which included claims against Cynthia Licata, to SWJ for $5.5 million.

29.    At the time that Arent Fox filed the March Sale Motion, it believed that (i) Licata was funding the purchase of the Assets by SWJ, and (ii) that Licata had secreted substantial funds with his wife Cynthia Licata.

30.    On April 25, 2005 the parties entered into the APA subject to approval of the United States Bankruptcy Court.

31.    On May 19, 2005 the Debtor filed a First Amended Asset Purchase Agreement ["FAAPA"]. Pursuant to the FAAPA, the Debtors agreed to transfer claims to ownership interests in limited liability companies, claims of ownership in and to certain mortgages, certain claims of ownership in joint venture agreements, certain causes of action against third parties, and other enumerated assets (the "Assets").

32.    On or about May 26, 2005, the Bankruptcy Court entered an Order (A) Approving Break-up Fee and Overbid Protections in Connection with the Sale of Assets (B) Approving Bid Procedures, (C) Scheduling Hearing to Consider

Approval of the Sale of Assets Free and Clear of Liens, Claims, Interests, and Encumbrances (the "Sale Order").

33.     As a result of, *inter alia*, the FAAPA and the Sale Order, SWJ provided Arent Fox with a deposit of $400,000 for its prospective purchase of the Assets. Nevertheless, upon information and belief, the deposit was not provided until after the auction, which is described below.

34.     The Sale Order approved certain bid procedures (the "Bid Procedures"). The Bid Procedures required all potential bidders to provide to counsel for the Debtors and the Committee with a deposit of –

> a letter stating that the Potential Bidder's offer is irrevocable until 15 days from the date that the Successful Bidder is required to close. "Successful Bidder" shall be the bidder that the Debtors, in their sole discretion and judgment, may determine makes the highest and best offer to purchase the Assets.

Under the Bankruptcy Court ordered Bid Procedures, the Debtors could "consider a bid only if the bid is completely in cash."

35.     On June 21, 2005, the Debtors auctioned (the "Auction") the Assets. SWJ and a second bid group that included Joe Chetrit, The Chetrit Group, Wennington Realty and Robert Wolf, Read Property Group (the "Alternate Bid Group") appeared to bid at the Auction. Upon information and belief, the Alternate Bid

Group appeared at the Auction with a $1,000,000 check for use as a down payment on its purchase of the Assets if it were the successful bidder. Arent Fox refused to accept the $1,000,000 check from the alternative bidder, but allowed the alternative bidder to bid for the assets nonetheless.

36.    SWJ was the successful bidder at the Auction. SWJ's winning bid was $8,950,000.00 [the "Purchase Price."] Upon information and belief, the Alternate Bid Group made a bid of substantially more than $5.5 million for the Assets. Despite being allowed to bid at the Auction, upon information and belief, the Alternate Bid Group did not provide a letter to Arent Fox indicating that its bid was irrevocable for fifteen days.

37.    On June 21, 2005, the Bankruptcy Court held a hearing to consider the Debtors' motion to have the Auction sale to SWJ approved by the Court. At the hearing, Arent Fox represented to the Court that the sale to SWJ conformed to the Bid Procedures.

38.    On June 21, 2005, the Bankruptcy Court signed an Order Authorizing and Approving (1) Asset Purchase Agreement, (2) Sale of Acquired Assets of the Debtors Free and Clear of Liens, Claims, and Encumbrances to SWJ Holdings, LLC, (3) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (4) Certain Related Relief (the "Sale Approval Order").

39.     The Sale Approval Order recites that SWJ is not an insider of any of the Debtors and is completely unrelated to the Debtors, but neither Arent Fox or Buchanan advised the Bankruptcy Court that Licata had previously claimed an interest in SWJ. The Sale Approval Order recites that Exhibit H to the FAAPA was a "Transfer, Settlement and Release Agreement" (the "TSRA") between Cynthia Licata, Licata's wife, and SWJ.

40.     Nevertheless, neither the Sale Approval Order, nor the comments of Arent Fox or Buchanan at the sale approval hearing, advised the Bankruptcy Court that the TSRA transferred a substantial portion of the Assets sold at the Auction to Licata's wife.

41.     Pursuant to the FAAPA, SWJ was required to close the transaction in which it purchased the Assets by June 27, 2005.

42.     SWJ failed to close the transaction contemplated in the FAAPA on June 27, 2005.

43.     On August 16, 2005, a plan of reorganization was filed for the Debtors funded, in part, by the monies to be received at the closing of the FAAPA with SWJ.

44.     On August 18, 2005, the Bankruptcy Court entered orders approving, and authorizing payment of, interim fees in favor of Buchanan in the amount of $107,660 and $458,240. Said awards are provisional and dependent upon an order

approving a final fee application, and said awards are subject to adjustment and disgorgement.

45.     On August 29, 2005, the Bankruptcy Court entered orders approving, and authorizing payment of, interim fees in favor of Arent Fox in the amount of $783,903.50. Said awards are provisional and dependent upon an order approving a final fee application, and said awards are subject to adjustment and disgorgement.

46.     On September 7, 2005, Buchanan applied to the Bankruptcy Court for additional fee compensation of $233,313.50.

47.     On September 16, 2005, with SWJ still having failed to close on the transaction contemplated by the FAAPA, the Committee sent a default notice to SWJ under the FAAPA.

48.     By way of a letter dated September 26, 2005 in anticipation of a Bankruptcy Court scheduled status conference on September 27, 2005, counsel for SWJ advised the Bankruptcy Court that SWJ had not paid the Purchase Price, but that the sale of the Assets contemplated by the FAAPA had "closed in escrow." In its counsel's letter to the Bankruptcy Court, SWJ explained that its funder, Cobra, had failed to close on a transaction with its funder, Arsad A. Kahn. Despite its lack of funds, or a funder with funds, SWJ's letter to the Bankruptcy Court offered to increase the Purchase Price to $11,000,000.

49.     Upon information and belief, during the period when the FAAPA was "closed in escrow" and the Purchase Price had not been paid, SWJ hypothecated, alienated, transferred and encumbered some of the Assets.

50.     In response to, *inter alia*, the default notice, SWJ, the Debtors, the Committee and Cobra agreed upon a Consent Order, which was entered by the Court on October 12, 2005 (the "October Consent Order"). Pursuant to the October Consent Order, Defendant Arent Fox and Defendant Buchanan Ingersoll, as attorneys for debtors and the Committee, agreed to modify the Sale Approval Order and FAAPA, by increasing the sale price and accepting as security a certain bank guaranty, ["Bank Guaranty"] issued by the Bangkok Bank PLC in the face amount of $50 million dollars.

51.     Cobra is the named beneficiary of the Bank Guaranty. It was agreed that the Bank Guarantee would be held by Arent Fox in a bank vault. The Conditions pursuant to which the Bank Guaranty could be presented for payment, released, or returned to Cobra were all set forth in the October Consent Order.

52.     Under the October Consent Order, deadlines were created for SWJ to close the transaction. The Purchase Price was increased to $11 million (or a lesser sum if the Purchase Price was paid by October 7, 2005 – five days before the execution of the October Consent Order). If there were no closing by November 25, 2005, the

estates would be free to sell to a different purchaser.

53.     Between October 11, 2005 and November 11, 2005, Buchanan attempted to use the Bank Guaranty as collateral to obtain a loan that SWJ could use to fund the remainder of the Purchase Price (as modified by the October Consent Order). Buchanan was unable to obtain such a loan because of issues raised by the proposed commercial lender concerning the validity of the Bank Guaranty.

54.     On November 11, 2005 after SWJ had not closed, the Debtors and the Committee sought approval for an alternative sale transaction involving Enterprise Asset Management, Inc ["Enterprise"]. The Debtors and the Committee sought to sell the Assets to Enterprise on the same terms and conditions as set forth in the FAAPA for $7.5 million.

55.     On November 16, 2005, the Bankruptcy Court entered an order authorizing a sale of the Assets to Enterprise (the "Enterprise Sale Order"). Under the Enterprise Sale Order, Enterprise was given until November 30, 2005 to conclude its due diligence and provide notice that it would close the transaction, which was required to be closed by December 2, 2005, time being of the essence.

56.     On November 16, 2005, at the hearing in the Bankruptcy Court on the potential sale to Enterprise, it was revealed that defendant Arent Fox had released its possession of the Bank Guaranty and delivered it to the Societe Banque Privee, S.A.

of Geneva, Switzerland ["SBP"].

57.     While it was defendant Arent Fox that transferred the Bank Guaranty to SBP, defendant Buchanan Ingersoll knew of and consented to the transfer of the Bank Guaranty.

58.     Also at the November 16, 2005 hearing, it was revealed that SWJ had not closed and remained unable to close on the purchase of the Assets as set forth in the FAAPA and the October Consent Order.

59.     At the hearing on November 16, 2005 Judge Shiff determined that the Court Order "was violated" by the transfer, and stated "whether or not sanctions will be imposed because of that is something I'll take up on a later date."

60.     Enterprise did not pursue the transaction.

61.     On February 2, 2006, with SWJ still having failed to tender any money toward the Purchase Price other than its initial $400,000 deposit, at a hearing on a motion of certain unsecured creditors to convert the Debtors' cases to cases under Chapter 7 of the United States Bankruptcy Code, at the request of Arent Fox and Buchanan on behalf of their respective clients, the Bankruptcy Court entered an order (i) increasing the Purchase Price to $11,250,000 and requiring a closing of the purchase of the Assets by February 15, 2006 and (ii) requiring Cobra to return the Bank Guaranty on or before February 16, 2006.

62.     SWJ did not close the transaction to purchase the Assets by February 15, 2006. Cobra did not return the Bank Guaranty to Arent Fox by February 16, 2006

63.     On February 21, 2006, the Debtors and the Committee moved to amend the prior orders of the Bankruptcy Court approving the sale of the Assets to SWJ and represented that SWJ had obtained $5 million in financing from Dare Investments, LLC and that said sum was being held in escrow by Arent Fox.  The Committee indicated that a new proposal, set forth in a letter agreement attached to its moving papers, provided a means for the estates to be paid the Purchase Price – which was now $11.25 million.

64.     On March 13, 2006 a closing of the sale of the Assets set forth in the FAAPA was held.  SWJ was the purchaser.

65.     At the closing Sellers conveyed the assets to Purchaser by assignment for consideration.

66.     The consideration was (i) the sum of $400,000 that had previously been deposited with Arent Fox on July 5, 2005, (ii) the sum of $ 5,000,000 deposited with Arent Fox on February 15, 2006 by Dare and  (iii) a Promissory Note in the amount of $ 5.85 million with an interest rate of 9% per annum with all interest and principal payable on December 15, 2006.

Case 2:11-cv-00266-BAK   Document 307   Filed 06/24/11   Page 42 of 51   Desc Main
Case 1:10-05066-DOK 1   Document 03/09/09   Entered 02/05/10 15:39:42   Desc Main
Document   of 38   Page 15 of 33

67.     As security for the Note, Purchaser, Sellers and Dare executed a certain Security and Intercreditor Agreement (the "Intercreditor Agreement") dated March 13, 2006.  Under the Intercreditor Agreement, the Debtor's estates were to receive a security interest in the Assets.

68.     Pursuant to the Intercreditor Agreement, the Debtors' estates have a second priority security interest behind a first priority secured claim by Dare in the amount of $6 million.

69.     Also on March 13, 2006, SWJ conveyed to Cynthia Licata a portion of the Assets it had purchased from the Debtors' estates pursuant to the TSRA.  SWJ conveyed these assets in exchange for no cash consideration, although Cynthia Licata did relinquish certain claims that she was making to a portion of the Assets.

70.     Upon information and belief, Cynthia Licata had disclaimed any interest in the Assets prior to the bankruptcy filing of either of the Debtors.

71.     The estates of the Debtors did not receive a security interest in that portion of the Assets transferred to Cynthia Licata pursuant to the TSRA.

72.     At closing, Cobra made and delivered a Guaranty and Security Agreement dated March 13, 2006, by which the Obligations of Dare were guaranteed by a collection of various guaranties of Bangkok Bank Public Company.

73.     Upon information and belief, the guaranties of the Bangkok Bank Public Company are not authenticate documents and are worthless.

74.     SWJ defaulted in payments for the assets, and was sued in an adversary proceeding captioned *Richard M. Coan, Trustee, et al v. SWJ Holdings, Inc.* Adversary Proceeding No. 07-05010.  The Trustees obtained a judgment in said adversary proceeding, but no money has been received on account of said judgment.

75.     Dare purports to have lent $ 5 million to SWJ and to have received a first lien on assets of SWJ as part of this transaction

## FIRST CAUSE OF ACTION

**Events prior to the Auction**

76.     Defendants Arent Fox and Buchannan Ingersoll had a fiduciary relationship to the Bankruptcy Estates. After the conversion of the bankruptcy cases to Chapter 7 cases, the Plaintiffs, as Trustees of the Bankruptcy Estates are the representatives of the Bankruptcy Estates.

77.     As an element of that fiduciary duty, both defendants had an obligation of fair dealing and honesty in regard to all actions in the APA, the FAAPA, the bidding, the auction, closing of the FAAPA transaction, safeguarding of assets and guaranties.

78.     Defendants had the fiduciary obligation of attempting to and actually

16

obtaining a recovery of the best and highest amount of consideration for the sale of the assets.

79.     Defendants had the fiduciary duty to structure the APA, and eventually the FAAPA, and the Terms in a fashion to avoid fraud, avoid sale of assets for less than full value, to create a situation in which the best and highest consideration was obtained for the bankrupt estate, create a situation in which the rights of the estate could be enforced against the bidder and create a situation in which due diligence was performed concerning the bidder and any alternative bidders.

80.     Defendants had the fiduciary obligation to investigate and to perform due diligence to determine the status of bidders.

81.     The Defendants had the fiduciary obligation to enforce theprocedures, and to determine which bid constituted the "best and highest" bid available at the auction.

82.     These obligations included safekeeping of assets and full disclosure of events pertaining to the APA or the FAAPA,

83.     Defendants negligently failed to render competent legal service prior to and at the auction when they failed to advise, direct, supervise, or otherwise guide the bankruptcy estates' investigation, and to perform due diligence concerning bidders possible conflicts of interest relating to the assets, asset transfers, and ability to fund the bids.

84. Defendants knew of, and failed effectively to enforce, the provisions of the APA and FAAPA in receiving irrevocable bids from the alternate bidder.

85. Defendants failed effectively to safeguard the assets, and failed to elicit bids for the assets. When bids were received for the assets, the Defendants failed to enforce the specific provisions of the Bid Procedures that referred to irrevocable bids.

86. Defendant Arent Fox, with the consent of Defendant Buchannan Ingersoll, represented to the court that the bid procedures were followed at the Auction, when the Auction in fact deviated from the Bid Procedures.

87. Both defendants failed to advise the Bankruptcy Court that Licata had previously claimed an interest in SWJ.

88. Both defendants failed adequately to investigate the financial ability and status of SWJ.

89. Both defendants failed adequately to determine whether any relationship existed among Licata, Cindy Licata and SWJ.

90. Both defendants failed to determine whether SWJ could presently, or within the applicable periods of time, actually close on the transaction.

91. Both defendants failed to timely obtain bidding documents from potential bidders, and failed in due diligence in their investigation of actual bidders.

92.     Both defendants failed to determine the actual financial status of SWJ and whether it had the capacity to close on the transaction, with adequate funds.

**Events at the Auction**

93.     Both defendants had an obligation to the Bankruptcy estate and to the court to hold the auction according to the procedures set forth in the bid procedures.

94.     The terms required that the sale be granted to the best and the highest bidder. Determination of what was the best and highest bid did not depend solely upon the amount of the bid, but rather required a consideration of the financial ability of the bidder, its credit history, the manner proposed for its funding and other financial considerations.

95.     No investigation was undertaken by either Defendant of SWJ.

96.     The lack of investigation was a deviation from good and accepted practice by the Defendants, each of whom owed a fiduciary duty to the bankruptcy estate.

97.     At the auction an alternate bidder was present, and proffered a certified check in the amount of $ 1 million dollars to secure its bid.

98.     Defendants refused to take the certified check as security for a bid, and similarly refused to require the alternate bidder to sign a memorandum making its bid irrevocable for the period of time set forth in the Bid Procedures.

99.     Upon information and belief, the alternate bidder eventually bid $ 8.8 million

for the assets, but its bid was not accepted. Because there had not been any irrevocable bid memorandum executed, there was no ability to close with the Alternative Bid Group when SWJ failed to close on its bid.

100. The SWJ bid was suspect for several reasons, none of which were adequately investigated by either defendant.

101. The bid was suspect for the purported relationship among Licata, Cynthia Licata and SWJ.

102. The bid was suspect for SWJ's inability to demonstrate financial ability to close.

103. Neither defendant investigated the financial capacity of SWJ or the alternative bidder.

104. At the auction, Defendants arbitrarily accepted SWJ's bid in the absence of any investigation into the provenance of the bid, involvement between SWJ and the debtor, involvement between SWJ and the wife of the debtor, Cynthia Licata; any investigation into the financial ability of SWJ to close; or any investigation into the merits of the alternative bid.

105. The bid was accepted, and the auction was closed even though SWJ did not and could not post its deposit.

106. Certain requirements of the terms were arbitrarily waived in favor of SWJ at

the auction.

**Post-Auction Pre-Closing Events**

107.   It was the fiduciary and professional obligation of the Defendants to ensure that all due diligence was undertaken with regard to the closing of the transaction arising from the auction.

108.   The Defendants had an obligation to investigate, *inter alia*, Such investigation would include the financial condition of the bidder, the financial condition of the alternate bidder, the assets, whether the successful bidder actually adhered to the terms of the bid, whether the successful bidder posted its deposit, and whether the bank guaranties subsequently proffered by the successful bidder, were genuine, adequate, valuable and properly tendered.

109.   The Defendants were obligated to follow all court orders, and incidentally, to safeguard the assets, the bank guaranty, the collateral, and in general, safeguard all components of the debtor's estate.

110.   Defendants failed in this respect, as they did not guard the assets of the bankruptcy estate, did not ensure that there was security for the bid amount under the terms, did not ensure that the assets remained within the hands of the estate up to and through the closing date, did not retain possession of the bank guaranty under the conditions set in the Court Order, and did not ensure that assets that were to be

sold, and for which no consideration had yet been paid, remained within the bankruptcy estate.

111.   During this period of time between the auction and the closing, assets were hypotheticated, were sold, were transferred and were placed beyond the reach of the bankruptcy estate.

112.   During this period of time, the bank guaranty was turned over to third parties over whom the Bankruptcy court did not have jurisdiction, and from which no security then existed.

113.   Defendants consented to the hypothecation of assets and transfer of assets without security, without control and to an entity or person beyond the jurisdictional reach of the Bankruptcy court, through the TSRA.

114.   Defendants did not employ due diligence in investigation of the TSRA and its effects upon the bankruptcy estate.

115.   Valuable assets, which should have remained within the bankruptcy estate or remained as security for the bankruptcy estates, until payment in full had been made by the bidder, were transferred to Cynthia Licata or an entity controlled by her.

116.   These assets then became beyond the reach of the bankruptcy estates.

117.   Significant attorney's fees were expended by the bankruptcy estates, and defendants made claims for significant attorney's fees, all of which diminished the

bankruptcy estates.

118. Defendants wholly failed in their obligations to shepherd the transaction, which resulted in extensions of the closing, and a failure of consideration in the transaction.

119. During this period of time assets were permitted to be alienated, the alienation of which damaged the bankruptcy estate.

120. Defendants wholly failed in their obligations to scrutinize the TSRA, which resulted in extensions of the closing, and a failure of consideration in the transaction.

121. Defendants wholly failed in their obligations to obtain the best and highest terms in the transaction, failed to enforce the terms, failed to engage the alternative bidder in the transaction, and failed to attempt to enforce the terms of FAAPA against SWJ, which resulted in extensions of the closing, and a failure of consideration in the transaction.

122. During this period of time defendants refused to take action even in the face of evidence and facts known to them that Cynthia Licata had connections with SWJ, and that Cynthia Licata was receiving assets from the Bankruptcy estate without any security interest remaining in the estate.

123. Defendants wholly failed in their obligations to the Bankruptcy Estate of

investigation and due diligence in this period of time between the auction and the closing.

124. By virtue of defendant Arent Fox's act of giving up possession and transferring control of the bank guaranty, it was no longer able to enforce post-bid, pre-closing obligations of SWJ.

125. Defendant Buchannan Ingersoll consented to and participated in the act of transfer.

Post Closing Events

But for the negligence of Defendants, Plaintiffs, as Trustees:

(a)     would have obtained  significantly greater assets for the estates, and would have had significantly lower administrative costs to be charged to the estate.

(b).    would have obtained proceeds of the bid, auction and closing earlier in time and at a significantly lower cost to the estate, thereby creating a greater bankrupt estate.

126. The bankruptcy estates wholly depended upon the Defendants' performance as attorneys for the debtor and the creditor's committee, in engaging in due diligence and investigation.

127.  But for the shortcomings set forth in this complaint, there would have been a better, different, more successful result in the bankruptcy case, consisting of a larger estate, lesser administrative costs, and smaller attorneys fees.

128.  Defendants, through their acts, proximately damaged the plaintiffs, as more fully set forth above, and caused the bankruptcy estates to incur greater administrative costs.

## SECOND CAUSE OF ACTION

129.  Plaintiffs repeat and re-allege the preceding paragraphs with the same force and effect as if fully set forth herein.

130.  Defendants negligently failed to render competent legal service, when they failed to advise, direct, supervise, or otherwise guide Plaintiffs in the holding of the auction and closing transactions

131.  But for the negligence of Defendants the bankruptcy estates:

    (a)   would have obtained full compliance with the bid and with the eventual closing transaction in the sale of the assets;

    (b)   would have received correct and responsive documents concerning financial aspects of the transaction;

    (c)   would have retained and organized relevant documents for the transactions;

    (e)   would have performed and undertaken adequate due diligence;

    (f)   would have participated appropriately in the transaction process;

Case 2:11-cv-60266-BAK   Document 307   Filed 06/24/11   Page 42 of 1082   Desc Main
Case 10-05016-DAK   Doc 1   Filed 03/09/09   Entered 02/05/10 15:99:42   Desc Main
Document   of 33   Page 26 of 33

(g)     would have complied with Bankruptcy Court orders.

132.  But for the negligence of Defendant, there would have been no issues with regard to the bidding process, the auction, the closing of the asset sale transaction, or payment.

133.  Defendants did not conduct, engage in, or instruct the bankruptcy estates how to adequately perform, due diligence investigation or analysis; or adequately supervise, participate in or otherwise guide the bankruptcy estates in the transaction process, or otherwise become appropriately engaged in the transaction in any generally accepted manner.

134.  Despite their obligation as attorneys for debtor and the Committee Defendants did not give Plaintiff any proper advice, did not give any advice on the transaction, on the security for the transaction, on the relationship among SWJ and Licata and Cynthia Licata, nor engage in any adequate investigation or due diligence, nor did defendants adequately retain the bank guaranty, nor did this ensure that the best and highest bid was accepted and acted upon.

135.  As a proximate result of these shortcomings, and but for these shortcomings, there would have been a greater bankruptcy estate and lower costs of administration.

136.  As a result plaintiffs were proximately damaged in an amount to be determined by the court and jury.

# THIRD CAUSE OF ACTION

137. Plaintiffs repeat and re-allege the preceding paragraphs with the same force and effect as if fully set forth herein.

138. When Defendants agreed to be retained in a bankruptcy action to represent the interests of the debtor and committee, and then sought legal fees to be awarded on a final basis by the Court, a contractual relationship was established of sufficient vitality to be actionable at law.

139. Defendants, in consideration of legal fees, agreed to provide specific competent and professional legal services consistent with the accepted legal norms of the profession. The services include, without limitation, engaging in certain actions, organizing the estate's litigation documents, advising plaintiffs on (i) document production, (ii) document organization, (iii) avoidance of bad faith, (iv) discovery responses, (v) privilege issues, (vi) due diligence, (vii) financial investigation, (viii) asset protection, (ix) preparation of bid documents, (x) analysis of bidding documents, including the APA, the FAAPA, the TSRA, and other agreements and orders. The services also include the investigation and retention of bank guaranties, investigation of bids, holding the auction according to the terms of

the auction, and all other necessary acts involved in the act of filing, holding and presenting documents in a case under chapter 11 of the United States Bankruptcy Code.

140.  The bankruptcy estates and Defendants entered into contracts through the retention process and in applications to the Bankruptcy Court in which Defendants represented parties to the action as attorney.  The Defendants specifically agreed to produce and accomplish the tasks and events set forth in the preceding paragraph and to be paid legal fees pursuant to court order.

141.  The bankruptcy estates granted its approval to retention applications as requested by Defendants, but Defendants breached the contracts formed thereby in their representation of the bankruptcy estates both in general, and *inter alia,* the failure to investigate, obtain or present, as stated above.

142.  But for the negligence and breach of contract of Defendants as set forth in detail above, there would have been a greater bankruptcy estate, lesser administrative and attorney costs, as more fully set forth in the preceding paragraphs.

143.  As a result, the bankruptcy estates were damaged in an amount of money to be determined by the court.

# FOURTH CAUSE OF ACTION

144. Plaintiffs repeat and re-allege the preceding paragraphs with the same force and effect as if fully set forth herein.

145. Defendants misled the court, withheld information from the court, obstructed the court, engaged in willfulness, were guilty of deceit or collusion, consented to deceit or collusion and did so with intent to deceive the court and/or one or more of the parties to the Bankruptcy Cases.

146. The behavior set forth in greater detail above, took place in pending litigation, namely, the Bankruptcy Cases. Defendants deceived the court and the litigants in the Bankruptcy Court through oral and written statements each made with the intent to deceive the court and the litigants during the course of ongoing litigation in U.S. Bankruptcy Court, District of Connecticut.

147. Defendants engaged in a chronic extreme pattern of behavior and legal delinquency in its wrongful communications. By this behavior, Defendants have violated **Judiciary Law § 487**.

146. Beyond this behavior, Defendants have acted with reckless disregard for the rights of others, and against the public in general, and are morally culpable within the meaning of punitive damages law.

148. Its behavior was undertaken in their own self-interest and was aimed at the public generally, through its use in a Court proceeding, which behavior evinced a high degree of moral turpitude and demonstrated wanton dishonesty as to imply criminal indifference to civil obligations.

149. By virtue of this violation, Plaintiffs are an injured party and are due treble damages.

150. Beyond treble damages under Judiciary Law § 487, Plaintiffs are due punitive damages under the circumstances of this case, in a reasonable amount to be determined by the court and jury.

**WHEREFORE**, Plaintiffs demand judgment against Defendants in a sum to be determined by the court and jury as an amount, which reasonably compensates plaintiff for damages and losses, with treble damages, punitive damages and attorney fees along with the disbursements of this action.

Dated:      New York, New York
            March 9, 2009

Andrew Lavoott Bluestone
233 Broadway, 27th Floor
New York, NY 10279
(212) 791-5600

Ron Chorches states that the following is true under the penalties of perjury.

Deponent is a PLAINTIFF, and has read the foregoing COMPLAINT and knows the contents thereof, that the same is true to deponent's own knowledge, except as to those matters therein stated to be alleged upon information and belief, and as to those matters deponent believes it to be true.

Deponent further says that the grounds of his belief as to all matters in the said complaint are based upon deponent's general investigation of the facts herein.

_____
Ronald  Chorches

Sworn to before me this
6th day of March, 2009

_____
Notary Public

My Commission Expires 7/31/2013

Richard M. Coan, Trustee of the bankruptcy estate of First Connecticut Consulting Group, Inc., states that the following is true under the penalties of perjury.

Deponent is a PLAINTIFF, and has read the foregoing COMPLAINT and knows the contents thereof, that the same is true to deponent's own knowledge, except as to those matters therein stated to be alleged upon information and belief, and as to those matters deponent believes it to be true.

Deponent further says that the grounds of his belief as to all matters in the said complaint are based upon deponent's general investigation of the facts herein.

Richard M. Coan, Trustee of the
Bankruptcy      Estate      of      First
Connecticut Consulting Group, Inc.

Sworn to before me this
9th day of March, 2009

Commissioner of the Superior Court

Case 2:11-cv-00266-BAK 1 Document 3-7 Filed 06/24/11 Page 121 of 122 Page 33
Case 10-05010 Doc 1 Filed 03/09/09 Entered 02/05/10 15:39:42 Desc Main
Document of Page 33 of 33

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
RICHARD M. COAN, Chapter 7 Trustee of First
Connecticut Consulting Group, Inc. and
RONALD I. CHORCHES, Chapter 7 Trustee of
James Licata,
      Plaintiffs,

   -against-                               C a s e  N o .

ARENT FOX, PLLC and
BUCHANAN INGERSOLL & ROONEY, PC

      Defendants.
-------------------------------------------------------------------X

**ANDREW LAVOOTT BLUESTONE**
**ATTORNEY FOR PLAINTIFFS**
**233 BROADWAY, 27th FLOOR**
**NEW YORK, NEW YORK 10279**
   **(212) 791-5600**

Please take notice:

<u>Notice of entry</u>  that the within is a certified or true copy of
      duly entered in the office of the clerk of the within named court on.

<u>Notice of settlement</u>  that an order  of which the within is a true copy will be presented for
settlement to the Hon. Judge
   one of the judges of the within named Court on      .

Dated:  March 9, 2009

                              **Yours, Etc.**

                         **ANDREW LAVOOTT BLUESTONE**