1

2

3

4              IN THE UNITED STATES DISTRICT COURT

5          FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

6

7

8

    _____
9                                        )
    DARE INVESTMENTS, LLC,               )
10                                        )
                                         )
11                                        )
                     Plaintiff,          )
12                                        )
         vs.                             )    Case 2:11CV266
13                                        )
                                         )
14   ARENT FOX LLP fka ARENT FOX         )
     KINTNER PLOTKIN & KAHN, PLLC, a New )
15   York Limited Liability Partnership, )
                                         )
16                   Defendants.         )
                                         )
17   _____)

18

19          BEFORE THE HONORABLE DALE A. KIMBALL

20                  SEPTEMBER 8, 2011

21          REPORTER'S TRANSCRIPT OF PROCEEDINGS

22                    MOTION HEARING

23

24

         Reported by:  KELLY BROWN, HICKEN CSR, RPR, RMR
25

```
1                          A P P E A R A N C E S

2      FOR THE PLAINTIFFS:   STROJNIK, PC

3                            BY:  PETER STROJNIK

4                                 Attorney at Law

5                            2415 EAST CAMELBACK ROAD, SUITE 700

6                            PHOENIX, ARIZONA 85016

7

8      FOR THE DEFENDANT:    FOLEY & LARDNER, LLP

9                            BY:  PETER N. WANG

10                                DOUGLAS S. HEFFER

11                                Attorneys at Law

12                           90 PARK AVENUE

13                           NEW YORK, NEW YORK 10016

14

15                           KIRTON & McCONKIE PC

16                           BY:  ROBERT R. WALLACE

17                                Attorney at Law

18                           1800 EAGLE GATE TOWER

19                           SALT LAKE CITY, UTAH  84145-0120

20

21

22

23

24

25
```

1          SALT LAKE CITY, UTAH, THURSDAY, SEPTEMBER 8, 2011

2                         *   *   *   *   *

3          THE COURT:  We're here this morning in the matter

4    of Dare Investments vs. Arent Fox, 2:11-CV-266.  The plaintiff

5    is represented by Mr. Peter Strojnik and Mr. Maoputasi Young;

6    correct?

7          MR. STROJNIK:  Yes, Honor.

8          THE COURT:  And defendant by Mr. Douglas Heffer,

9    Mr. Robert Wallace.

10         MR. WALLACE:  Yes, Your Honor.

11         THE COURT:  And Mr. Peter Wang.

12         MR. WALLACE:  Yes.  This is Mr. Wang, and he'll be

13   arguing, Your Honor.

14         THE COURT:  All right.  This is defendant's motion

15   to dismiss or in the alternative to transfer.

16         How much time do you think you need, Mr. Wang?

17         MR. WANG:  I think 10, 15 minutes at the most.

18         THE COURT:  What about you, Mr. Strojnik?

19         MR. STROJNIK:  Your Honor, I believe that

20   15 minutes would be sufficient.

21         THE COURT:  Thank you.  Go ahead, Mr. Wang.

22         MR. WANG:  Thank you, Your Honor.  Good morning.

23   And there are actually a number of items before the Court in

24   addition to the motion to dismiss or transfer.  Your Honor is

25   also aware that we have sent certain letters regarding

1    Mr. Strojnik's conduct or what we regard as misconduct in this

2    matter.  I will not address those unless Your Honor wants

3    me --

4              THE COURT:  You don't need to address those.

5              MR. WANG:  All right.  So let's talk about the

6    motion to dismiss or transfer, Your Honor.

7              THE COURT:  All right.

8              MR. WANG:  I think there's almost an irresistible

9    temptation to really talk about the motion to dismiss first.

10   This case has no legs.  It has no substance.  It is not

11   plausible to use the Twombly standard that applies in the

12   federal courts.  And I think that, therefore, for all the

13   reasons we set forth in our papers which I will describe this

14   morning it should be dismissed.

15             However, I also understand that in the normal

16   course courts will first look at the motion to transfer

17   because that is something that before you need to busy

18   yourself with the motion to dismiss and the substantive

19   arguments we make with respect to that Your Honor might want

20   to address or consider the motion to transfer because that

21   really overrides everything here.  So I want to talk about

22   that first of all --

23             THE COURT:  All right.

24             MR. WANG:  -- if I could.

25             There is no question that this case could have and

1    we believe should have been brought in the District of

2    Connecticut and, in fact, in the bankruptcy court in

3    Connecticut.  Mr. McCloskey, who sits in-between his lawyers

4    there, who is the principal of Dare, He submitted himself to

5    the jurisdiction of the bankruptcy court in Connecticut.  He

6    made his arrangement, his financial arrangement subject to the

7    district -- to the bankruptcy court in Connecticut to

8    Judge Shiff, Bankruptcy Judge Shiff in Bridgeport,

9    Connecticut.  He appeared before him.  Dare appeared before

10   him.  Everything was subject to court orders before Bankruptcy

11   Judge Shiff.

12        And there is no question that this action is within

13   the "related to" jurisdiction under the Bankruptcy Code.

14   There is no question that Judge Shiff has in front of him all

15   of the salient items that are now brought to Your Honor for

16   determination, in particular the meets and bounds of the

17   escrow agreement, which is really what controls here because

18   that is what this is all about, an escrow agreement that

19   according to my friend we violated or are guilty of fraud in

20   some respect.

21        So we believe for all those reasons that there

22   should be transfer.  And, in fact, Your Honor, there is a

23   serious question as to whether or not there's even diversity

24   jurisdiction here because of the presence of at least one

25   partner of Arent Fox.  Arent Fox is a national highly

1    respectable law firm out of -- primarily based in Washington

2    with offices in New York and throughout the country.

3              THE COURT:  One partner here, you say?

4              MR. WANG:  There is a partner who has a residence

5    in Utah, and we made reference to that in our memorandum.  So

6    there is a question as to whether or not there would be full

7    diversity here.  However, under the law, under 1404(a), that

8    does not stop Your Honor from transferring the case to a place

9    where it could have been brought, which would be Connecticut,

10   with a reference to the bankruptcy court in Connecticut.  In

11   fact, that actually is what happened.  There was another case

12   that was brought in the Southern District of New York which

13   was transferred to Connecticut under somewhat analogous

14   circumstances.

15             So for all of those reasons, Your Honor, we believe

16   that the outcome of this case, were it not to be dismissed,

17   and again, in our view it would be dismissed here or in

18   Connecticut, but it would have a significant affect on the

19   administration of the underlying bankruptcy estate, which

20   still sits in front of Judge Shiff.  That case is still

21   ongoing.  The assets of the estate are still subject to

22   various sale orders and negotiations.  That case is ongoing.

23   And Judge Shiff has in front of him a variety of adversary

24   proceedings that involve third parties including Arent Fox.

25             So this should be one more of those.  And

1    Judge Shiff who issued the orders which are in part being

2    attacked here, in part being attacked here, the approval of

3    the sale, the approval of the escrow agreement, that

4    Judge Shiff should be the one who deals with that.  So that's

5    why for all those reasons we believe the case should be

6    transferred.

7            But fundamentally, that's why I say, Judge, the

8    urge is irresistible really to jump right into the dismissal

9    is because this case is so odd.  This case completely --

10           THE COURT:  Although odd is not a basis for

11   dismissal.

12           MR. WANG:  No, it's not.  When I say it's odd,

13   Judge, what I mean by that is when you read the complaint, I'm

14   sure Your Honor has reviewed the papers, it's fairly

15   convoluted to try to keep track of who were the purchasers and

16   who were the sellers and who were the lenders and who were the

17   investors.  But really at base what it comes down to is this,

18   something very, very simple.  Arent Fox was the lawyer for the

19   debtor.  Not the lawyer for Dare, not the lawyer for

20   Mr. McCloskey, not the lawyer for the people who Dare was

21   lending money to.  And the business of the bankruptcy court

22   was to see if they could sell the assets of the bankrupt.

23           There is a company called SWJ that put a proposal

24   to buy the assets of the bankrupt.  And it turned out that

25   they defaulted on that purchase because they didn't have the

1     money, they didn't have the wherewithal to do it.  So there

2     kept being negotiations and renegotiations to see whether or

3     not SWJ could come up with the money to purchase these assets

4     out of bankruptcy.

5              They came upon Mr. McCloskey and Dare.  And what

6     Dare was going to do was to lend money to SWJ/Cobra Ventura

7     because there was kind of an arcane arrangement as to how that

8     was being done.  They were going to lend money, they were

9     going to lend $5 million in return for a $12 million payday,

10    which is a pretty nice return.  However, it is clear that at

11    the time they made that, they were aware that this was a very

12    risky proposition.  They were aware, and we set it all out in

13    our papers, that SWJ was -- had no financial footing

14    whatsoever other than a deposit they had earlier made of some

15    $400,000.  But they went forward.  And what they did is they

16    asked, the parties asked Arent Fox who was simply the lawyer

17    for the debtor to hold the money in escrow pending the

18    finalization of the loan agreement and all of the conditions

19    for the escrow so that $5 million would be paid out as part of

20    this new approved purchase price, a sale order that was

21    approved by Bankruptcy Judge Shiff.  That is the beginning and

22    the end of what Arent Fox's involvement is here.

23              And if I may hand up to Your Honor, it's an

24    exhibit, but it might be easier.  This is the escrow

25    agreement.

1         THE COURT:  Do they have a copy?

2         MR. WANG:  Yes.  It was attached to the complaint

3    and attached here, the escrow.

4         MR. STROJNIK:  Okay.

5         MR. WANG:  May I approach, Your Honor?

6         THE COURT:  Yes.

7         MR. WANG:  And that's it, Judge.  The escrow

8    agreement is what controls here.  And if Your Honor could look

9    at the escrow agreement for a second, let me point out to you

10   this is -- as limited an escrow agreement as Your Honor could

11   possibly imagine, if you look at the fourth "whereas" clause,

12   for example, on the first p[age, you see that the parties

13   desire -- the parties desire and request that the escrow

14   agent, escrow agent being Arent Fox, be engaged as the agent

15   to hold the escrow funds, if necessary, in escrow and to

16   distribute the escrow funds in accordance with the terms and

17   conditions hereof.

18         In the next "whereas" clause, it confirms that

19   Arent Fox can continue to serve as the debtor's counsel.

20         And then the terms, Section 1, talks about the

21   escrow agent's duties and responsibilities.  And the duties

22   and responsibilities are what determined that this case should

23   be dismissed.  On Paragraph A:

24         The duties and responsibilities

25     of the escrow agent -- as escrow agent shall be

1      limited to those expressly set forth in this

2      agreement.  No implied duties shall be read

3      into this agreement.

4           I'll stop right there.  A point is made with

5      respect to the so-called implied covenant of good faith and

6      fair dealing.  No, Your Honor.  The case law is clear that

7      when a contract specifically delimits, specifically delimits

8      the meets and bound of the escrow agent's responsibilities you

9      cannot read into that agreement anything more than what is

10     there.

11          And, in fact, my friend cites the case that

12     provides exactly that, even though he cites it for the other

13     proposition, World Wrestling Entertainment case.  It provides

14     exactly for that proposition.  It is enforceable according to

15     its terms.

16          If Your Honor then goes down to Paragraph G, you

17     see that in Paragraph G the escrow agent will be liable for

18     its gross negligence or willfulness conduct if it's the

19     primary cause of any loss to the purchaser or the seller.

20          Now, if Your Honor goes back to the first page,

21     you'll see that the purchaser is SWJ Holdings.  It is not

22     Dare.  It is not Mr. McCloskey.  So they are not within the

23     umbrella even if there was a claim for gross negligence and

24     willful misconduct, which there is not.  It only applies to

25     SWJ.

1          Paragraph H, it continues that the escrow agent is

2   not responsible by reason of forgeries or false

3   representations made by third parties.

4          Its sole obligation, I'm reading from Paragraph H

5   right in the middle of the paragraph:

6          Its sole obligation shall be to deliver the

7          escrow funds as required hereunder or to resign as

8          permitted hereunder.

9          That's it.  Now, Judge, what is this case about?

10  According do Mr. Strojnik, according to Mr. Strojnik, we had a

11  duty, we, the debtor's counsel, had a duty to disclose to them

12  things that they already knew, but in any event, we had duties

13  to disclose to them as though we were their lawyer with duties

14  of disclosures about these so-called bank guarantee forgeries,

15  I'm not going to go over the four items they said we had a

16  duty to disclose.

17         But, Your Honor, the escrow agreement eschews all

18  of that.  The escrow agreement makes it perfectly clear that

19  our only obligation was to hold -- and when you think about

20  it, it makes sense -- to hold the money and disburse the

21  money.  That is what an escrow agent does.  And this agreement

22  is at pains to make sure that there are no other duties.

23         Continuing to Paragraph J, if Your Honor please,

24  the next-to-last sentence of Paragraph J:

25         The escrow agent shall have no duties or

1          responsibilities except those expressly set forth

2          in this agreement.

3               Paragraph M, on the next page, Your Honor, the

4     middle of that paragraph:

5          The duties of the escrow agent hereunder are

6          intended to be solely ministerial in nature.

7               Your Honor, it is repeated time and time again

8     because Arent Fox was not in relation, other than as escrow

9     agent to hold and disburse, Arent Fox was not in relation to

10    Dare or Mr. McCloskey.

11              So what are the items of nondisclosure?  What are

12    the so-called items of nondisclosure?  There are four of them.

13    The first one is that Arent Fox should have disclosed to Dare

14    that the so-called bank guarantees were forgeries.  That with

15    great trumpets that the plaintiff says, look at this e-mail

16    that we found.  And this shows that they knew about it.  They

17    knew that the bank guarantees were forgeries.  Well, that's

18    very interesting, except two things get in the way of that.

19              Number one, it was disclosed to the Court before

20    the escrow broke.  We submitted that, Your Honor.  We

21    submitted chapter and verse from the transcript of the

22    February 27th hearing before Judge Shiff in which it was

23    plainly disclosed that the bank guarantees were thought to be

24    forgeries and had no value, number one.

25              Number two, in any event, the final loan agreement

1    didn't even give Dare any interest in the bank guarantees.  So

2    it's a fairly dramatic e-mail they want to make some hay out

3    of it, but it has no relevance whatsoever because they had no

4    interest in these bank guarantees under the loan agreement.

5    And in any event, it was fully disclosed in court, in court

6    with all parties present.  In fact, I believe as it says in

7    the transcript, everyone in this courtroom knows that those

8    bank guarantees are forgery and -- are forgeries and are of no

9    value.  That's number one about the bank guarantees.

10           Number two.  Arent Fox should have disclosed that

11    SWJ had no financial health.  It is clear Mr. McCloskey put

12    his own affidavit into a New Jersey proceeding where he's

13    seeking to sue another party in connection with these losses,

14    a title company, that Dare did its own due diligence.  They

15    were the ones who were lending the money to SWJ.  And a notion

16    that we were supposed to have some duty to disclose what their

17    borrower's financial condition is is absolutely mind blowing.

18    They were fully aware of SWJ's financial ill health.  They've

19    admitted it in court, and to blame Arent Fox for that is

20    really beyond implausible.

21           Number three.  Arent Fox should have disclosed to

22    Dare there was another party, so-called Mocco parties, who

23    were also making claims to the assets.  Well, Your Honor, that

24    would be interesting, except, again, Mr. McCloskey in court

25    put in an affidavit in this other proceeding in which he

1    specifically said that he was fully aware of the Moccos'

2    claim.  He was aware of the Moccos' claim before he submitted

3    the money, and he knew, therefore, there was a risk that

4    another party might have a superior right to the assets that

5    were going to be held as security.  So that has no legs.

6         And then finally number four, which to me is

7    perhaps the most outrageous, is that Arent Fox should have

8    disclosed that some of the money that was coming out of the

9    escrow was going to be used to pay Arent Fox's fees.  Arent

10    Fox's fees had been approved months and months before.  And

11    under the bankruptcy court, as Your Honor understands,

12    administrative costs including the fees of the debtor are paid

13    in the ordinary course.  The sale of the asset of the debtor

14    obviously engorged the estate, gave money to the estate, which

15    the estate was then able to use to pay out various obligations

16    including but not limited to the Arent Fox fees.

17         So again, the idea that somehow we needed to

18    disclose that this money was going to be otherwise coming to

19    us once it was paid to the estate is nonsense.  It is in the

20    ordinary course of a bankruptcy approved fee order that had

21    been approved months before and was on the docket.

22         So there you have it, Judge, if I could just kind

23    of wrap it up in a bow.  The case has no substance to it.

24    There is a lot of drama, and there's a long narrative.  And

25    the opposition papers do no more than repeat the narrative

1    without any analysis whatsoever.  But this is a strike suit.

2    This is a suit that follows on the heels of another lawsuit

3    they brought in New Jersey against a title company.  They are

4    rooting around for some deep pocket to make good on the loss

5    of their bad business investment.  They lent $5 million with

6    the hope that they recover $12 million, a very, very

7    substantial and healthy return, indeed, had it come to pass.

8    It did not come to pass, but they cannot blame Arent Fox for

9    that.  Arent Fox, the debtor's lawyer, had its obligation ran

10   to the debtor, to its client and not to Dare, other than to

11   hold the money and to disburse it, which it did according to

12   the terms of the escrow.

13          The case doesn't belong here and never should have

14   been brought here.  But wherever it sits, whether it's here or

15   in Connecticut, it should be dismissed.

16          THE COURT:  Thank you, Mr. Wang.

17          MR. WANG:  Thank you.

18          THE COURT:  Mr. Strojnik?

19          What do you say to the argument that the escrow

20   agreement itself does seem to limit the duties and obligations

21   of the defendant here?

22          MR. STROJNIK:  Your Honor, the escrow agreement

23   specifically provides that the escrow agreement is going to be

24   construed according to the laws of the state of New York.  The

25   laws of the state of New York are very clear on what kind of

1   limitation of liability can be imposed or can be included

2   within an escrow agreement.  The laws of New York very clearly

3   state that a contractual provision limiting liability is

4   enforceable only in the absence of, number one, a special

5   relationship between the parties; or, number two, a statutory

6   prohibition; or, number three, an overriding public policy.

7           In this case, Your Honor, we have the presence of

8   all three elements.  The first element, a special relationship

9   between the parties, is specifically decided by the New York

10  Supreme Court as being a relationship between an escrow agent

11  and the escrow principal.  That's what we have in this case.

12  We have an escrow agent and the escrow principal.  The escrow

13  principal is Arent Fox -- I'm sorry -- is my client Dare

14  Investment, the escrow agent is Arent Fox.

15          In addition, Your Honor, New York law provides that

16  an attorney accepting money from a nonparty, a non-client

17  assumes a fiduciary obligation irrespective of any agreement.

18  New York law is somewhat different from other laws in the

19  United States in that respect in that in the New York law for

20  a fiduciary obligation to arise under an escrow agreement,

21  there has to be a writing except, except when a fiduciary

22  obligation arises out of a relationship between an attorney

23  and a person who invests or who puts the money into the

24  attorney's account.  And that's what we have in this case.

25          Thirdly, New York law has a very, again, unusual

1    provision which applies in this case, and that is New York

2    fiduciary law Section 487.  That particular section of the

3    New York judiciary law provides that if an attorney in

4    providing his services either to a client or to a third party

5    or to anyone for that matter commits any kind of deceit, he,

6    number one, commits a misdemeanor, and, number two, he is

7    responsible for damages.

8            So to say that under New York law a limitation of

9    liability is enforceable is simply wrong.  It simply does not

10   comply with New York law, and I believe that there is no

11   dispute even from Arent Fox that in this particular case

12   New York law applies to the escrow agreement.

13           But, Your Honor, I would like to correct some of

14   the factual issues that have been or statements that have been

15   made and perhaps expound upon them.

16           THE COURT:  Excuse me.  Before you do that --

17           MR. STROJNIK:  Yes.

18           THE COURT:  -- let's assume for a moment that

19   you're right about New York law and that there is a basis for

20   this lawsuit.  Why shouldn't I just transfer it to Connecticut

21   where there seems to be several related-type things going on?

22           MR. STROJNIK:  Your Honor, there were two reasons.

23   Number one, there is no jurisdiction that this Court would

24   have --

25           THE COURT:  How about related to jurisdiction in

1    the bankruptcy code?

2            MR. STROJNIK:  There are two jurisdictions issues

3    here.  The first one is that this Court from my understanding

4    can transfer the case perhaps to the district court in

5    Connecticut but cannot transfer it to a bankruptcy court in

6    Connecticut.  So this would have to be a two-step process

7    procedurally.  First this Court would have to transfer to the

8    district court, and then the district court could possibly

9    transfer it to the bankruptcy court.

10           But getting to the point of jurisdiction, we did

11   address that at length in our response, and there is one case

12   that we found that talks specifically about the interplay or

13   interaction between "arising to," "arising under" and

14   "relating to."  And that case is In re Grand Central Building

15   LLC, Bankruptcy Court, ND West Virginia 2011 case, in which it

16   says that the question is whether or not the outcome of this

17   case will somehow impact the estate in the bankruptcy case.

18           Your Honor, this case does not include any assets

19   of the bankruptcy estate.  It does not include any rights or

20   obligations of the debtor in the bankruptcy estate.

21           THE COURT:  So you're saying it's not really

22   related to.

23           MR. STROJNIK:  It's completely unrelated.  And I

24   believe that under the case that I have cited that will be the

25   case.

1          In addition, Your Honor, this is the proper forum

2   because most of the parties reside in the state of Utah.

3   There are some important parties in this case that would make

4   very important witnesses.  The first of the most important

5   obviously is Dare Investments whose principal Rich McCloskey

6   is sitting in the courtroom today.  He resides in Utah.  He

7   was brought into this deal by a lawyer here in town by the

8   name of Gordon Duval.  He resides in Utah.  The transaction

9   was handled by a local law firm through a fellow named

10  George Pratt, who is a lawyer in Utah.  These are going to be

11  the witnesses in this case.

12          The other witnesses Bob Grossman lives in New York.

13  Peter Mocco lives in New Jersey.  James Scarpone lives in

14  New Jersey.  And I try this name the best I can.  Jessada

15  Sawatdiong lives in Bangkok.  Jim Licata --

16          THE COURT:  All except for Bangkok, all of those

17  other places are close to Connecticut.

18          MR. STROJNIK:  Your Honor, it is true that they may

19  be geographically close, but the question is not whether or

20  not it is geographically close, the question is more whether

21  or not there is actual presence in the state in my estimation.

22  And even though Robert Grossman may be closer to Connecticut

23  than to the state of Utah, clearly Mr. McCloskey is closer to

24  the state of Utah than he is in the state of Connecticut.

25          But the most important fact here in a venue issue

1    is the choice where the plaintiff makes where to bring the

2    case.

3              THE COURT:  That certainly is an important factor.

4              MR. STROJNIK:  And I also believe, Your Honor, that

5    this Court is the appropriate court because most of the events

6    occurred here.  The money came from here.  The $5 million was

7    wired from here.  The escrow agreement was signed here.  The

8    deal was made here between Dare Investments and Gordon Duval.

9    Everything that happened in this case happened here, and it

10   happened in a very, very quick sequence of time.  It all

11   happened in February of 2006.  And this is what I want to talk

12   about for a moment, unless, of course, Your Honor has other

13   questions.

14             THE COURT:  Go ahead.

15             MR. STROJNIK:  This is -- the FCCG bankruptcy, Your

16   Honor, is a bankruptcy consolidating a number of other

17   bankruptcies by the name of FCCG standing for First Federal --

18   I'm sorry -- First Connecticut Consulting Group, and there's

19   one company named Group One, Group Two, Group Three,

20   Group Four and so forth.  Another bankruptcy is a bankruptcy

21   filed by Jim Licata.  All those bankruptcies were consolidated

22   into the one bankruptcy in 2002.  Arent Fox became a lawyer

23   for the bankruptcy estate in 2003.  I believe that was in May

24   of 2003.

25             The important thing about the bankruptcy is that

1    the assets of the bankruptcy, approximately $25 million of

2    assets, are toxic.  They don't belong to the bankruptcy

3    estate.  They -- a claim has been made to all those assets by

4    a fellow named Peter Mocco.  Peter Mocco is a formidable man

5    out of New Jersey who has been involved in this litigation for

6    close to 20 years with Jim Licata.  Everybody, Your Honor, and

7    I mean everybody in the bankruptcy proceeding, everybody knew

8    and certainly Arent Fox knew that the assets were toxic, that

9    the assets were worthless, that nobody would possibly buy the

10   assets.

11        SWJ came into the picture in 2005.  In 2005,

12   Arent Fox had approximately $1 million of fees that were

13   unpaid.  In 2005, SWJ rides into town without a dime to its

14   name, without assets to its ownership, with absolutely

15   nothing, and he makes a proposal for Arent Fox to buy the

16   assets.  Arent Fox says, okay, we'll go to the judge.  We'll

17   push it through.  And they do.  But obviously SWJ can't

18   complete the purchase because it has no money.  The deal falls

19   through.

20        Then in October of 2005 SWJ comes back again and

21   says, well, this time I've got $50 million in Bangkok bank

22   guarantees that will guarantee the purchase.  Will you push it

23   through this time?  Arent Fox tries.  Arent Fox takes the

24   50 million in Bangkok bank guarantees, takes them to

25   Switzerland, finds out they're completely worthless, that

1    nobody is going to deal with them, that they are simply

2    fraudulent, and doesn't the do the deal.  Ultimately Arent Fox

3    goes back to court and gets fees approved for just less than

4    $2 million.

5            Your Honor, at that time there is no cash other

6    than approximately $600,000 in the estate.  The assets are

7    completely toxic.  Nobody will touch them.  Nobody will do

8    anything with them.  Everybody knows that.

9            Mr. Wang made a comment earlier how this all was

10   discussed with Judge Shiff in the bankruptcy court.  Well,

11   yes, it was.  My client wasn't there.  His lawyers weren't

12   there.  And the disclosure was almost jolted.  It was like

13   saying to the judge, you know, Judge, everybody knows this is

14   all a big fraud.  Everybody, Arent Fox knew, SWJ knew,

15   everybody knew, except Richard McCloskey.  He didn't know.

16   And nobody told him.

17           So what happened here was SWJ calls Gordon Duval

18   here in Utah in Salt Lake City.  He said, Gordon, can you find

19   somebody who is going to put up $5 million?  Gordon called

20   Richard, and Richard says, okay, I'm going to make a deal.

21   And it all happens, Your Honor, it all happens within 14 days.

22   Gordon calls Richard, and Richard says, it sounds like it's

23   going to be a good deal.  I'm going to rely on the Bangkok

24   bank guarantees that everybody knew by now except for Gordon

25   and -- I don't even know about Gordon, but everybody knew were

1    fraudulent.  I'm going to get paid back, and I'm going to make

2    a nice chunk of money.

3            The point of this lawsuit, Your Honor, is not just

4    that Arent Fox didn't disclose it had an interest and that the

5    only way Arent Fox was going to get paid was if my client

6    would put up $5 million, it is also that the entire bankruptcy

7    in Connecticut is fraught with fraud, and everybody knows

8    about it.  There have been lawsuits filed against Arent Fox by

9    the current trustee in bankruptcy for malpractice and fraud.

10   Everybody knows except my client.

11           And ultimately my client comes up and says, well,

12   in May of 2009, he goes and talks to Peter Mocco, and

13   Peter Mocco says, you know, you better look into this because

14   everybody knows this is fraudulent.

15           Mr. Richard McCloskey goes to see me.  We talked

16   about this.  We have a different case in New Jersey on a

17   different matter.  And as part of the investigation of that

18   case, we find out on February 11th, 2011, from an e-mail from

19   James Scarpone, who's the attorney for Peter Mocco, in the

20   myriad of litigation matters back in New Jersey, we find out

21   that Bangkok counsel told Arent Fox on February 9th, on

22   February 9th that the Bangkok bank guarantees were fraudulent.

23           On February 14, the escrow agreement is signed.  On

24   February 15, my client wires $5 million to Arent Fox, not to

25   the estate, Your Honor, not to SWJ, not to a title company, to

1   Arent Fox.

2         Your Honor, I would like to hear questions that

3   Your Honor might have on that.

4         THE COURT:  I don't have any more.  Do you have

5   anything else you want to tell me?

6         MR. STROJNIK:  No.  Thank you, Your Honor.

7         THE COURT:  Thank you, Mr. Strojnik.

8         MR. STROJNIK:  Thank you.

9         MR. WANG:  Your Honor, may I?

10        THE COURT:  Reply, Mr. Wang?

11        MR. WANG:  Thank you, Your Honor.

12        THE COURT:  Now, what do you say to the argument

13   that New York law doesn't permit you to limit your liability

14   under the escrow agreement in the way you have?

15        MR. WANG:  It's wrong.

16        THE COURT:  And you agree New York applies as it

17   says so in the escrow agreement?

18        MR. WANG:  Yes.  Sure, New York law applies.  But

19   the citation note of what the limitation does or doesn't do is

20   just flat wrong.  The cases that we cite, I think it's Page 3

21   of our reply brief, set it out chapter and verse.  It's just

22   not right.  I mean, he says it, but it's just not right.

23   There is no law that supports it at all.  The case law is

24   exactly to the contrary.  The various cases, I think we cite

25   three or four cases that make it absolutely clear that you can

1    have limitations in an escrow agreement, precisely what we

2    did.  And that's it.

3              To the extent -- you know, Judge, to the extent

4    that an escrow agent has fiduciary duties, it has duties, it's

5    the duty to take the money and to hold it and then disburse it

6    according to its terms.  It's not some free-floating

7    disclosure duty for everything in the world.  It's a very

8    narrow kind of a duty.  That's the relationship.  There's no

9    special relationship other than the escrow relationship.

10             And the cases, Your Honor, the cases that we cite,

11   it's on Page 4, excuse me -- Page 4 of our reply brief, the

12   Sommer case, Peluso case, Egnotovich, Timmins, and Robinson v.

13   Robinson, all cases, all cases, including even in the highest

14   court of New York make it absolutely clear that you can and

15   often times do have those limitations.  So I just don't know

16   where he gets it from.  He says it, but it's not true.

17             Now, I have to say, Your Honor, I was listening to

18   Mr. Strojnik's description of what happened here, and I've

19   never -- I can't remember a situation listening to somebody

20   completely argue himself out of court by what he says on oral

21   argument.  Mr. Strojnik stood up here and said to Your Honor,

22   I wrote it down as he was saying it, everybody knew the assets

23   were toxic.  Everybody knew that the Bangkok bank guarantees

24   were forgeries.  Everybody knew that there was fraud just

25   inherent in this entire --

1            THE COURT:  I guess he qualifies and said his guy

2    didn't know.

3            MR. WANG:  Exactly.  And that's what I was coming

4    to.  And then he says, but Mr. McCloskey didn't know.  Well,

5    first of all, Mr. Duval who was acting as the attorney for SWJ

6    and Cobra Ventura and according to the papers he submitted for

7    Mr. McCloskey, as well.  He was in court, number one.  Number

8    two, Mr. Mournes, who was the other lawyer for the venture, he

9    was in court, as well.  But what's more important everybody

10   knew, but poor Mr. McCloskey, he wasn't aware until Mr. Mocco

11   told him in 2009.

12           Now, Judge, we all understand there is a certain

13   due diligence activity that people have to -- the Court is not

14   going to protect somebody who just sits in the dark and

15   doesn't look.  And in this situation we have Mr. McCloskey

16   saying in court how he hired lawyers in New Jersey, a squat of

17   lawyers to do due diligence about this deal.  He wants Your

18   Honor to believe that he gave $5 million to SWJ without a lick

19   of diligence because if it was so known to everybody about the

20   guarantees were forgeries, there was fraud throughout the -- I

21   mean, all -- I'm putting aside whether or not this is all true

22   or false, Judge.  It's not the point.  The point is he admits

23   that everyone knew, but he should be protected.  He didn't

24   know.

25           Now, Judge, the law doesn't allow that, and Your

1    Honor understands that well.  The law doesn't allow someone to

2    sit back, and I'm even putting aside the statute of

3    limitations argument, to sit back 2006, 2007, 2008, not until

4    2011 does he bring the lawsuit and supposedly because he now

5    finds an e-mail in 2011, that's way beyond any statute of

6    limitations.  We made that argument, as well, in our papers.

7              THE COURT:  Let me ask you a question about the

8    transfer issues.  Mr. Strojnik cited a West Virginia case that

9    suggests if I wanted to transfer this case to Connecticut,

10   it's not really related to.  Do you have anything to say about

11   that?

12             MR. WANG:  Yes, indeed, Judge.  The related to

13   jurisdiction makes it clear that, the Celotex case out of the

14   United States Supreme Court makes it clear that anything that

15   affects the estate.  Now we all understand, I'm sure

16   Mr. Strojnik would be the first one to endorse it, that Dare

17   ended up with a $6 million preparation claim in the bankruptcy

18   estate.  It still has that now.  It is a creditor in the

19   bankruptcy estate.  And once the estate assets are sold,

20   whatever they're sold for and however they're sold, there will

21   be a distribution of assets which will go to Dare.  But they

22   won't go to Dare obviously if Dare recovers against whether

23   it's Arent Fox or the Chicago company or the various people

24   that Dare is running around suing to try to recover its

25   losses.

1          So this will have an impact in effect on the estate

2     administration, which is exactly the language of the related

3     to jurisdiction.  There is no question but that Mr. Strojnik

4     could have gone to the bankruptcy court and brought this

5     lawsuit.  No question whatsoever.  Judge Shiff approved the

6     sale order.  He approved the escrow agreement.  He approved

7     the disbursal of the funds.  All those things were done by

8     Mr. Strojnik -- by Mr. McCloskey going into Connecticut, going

9     to the bankruptcy court and submitting himself to that

10    jurisdiction.  But he doesn't want to have Judge Shiff review

11    this because he knows that Judge Shiff gave his blessing to

12    what went on here.  There is no fraud in connection with this

13    bankruptcy despite what Mr. McCloskey says.

14         Now, I will tell you what this boils down to.  They

15    got swindled by SWJ.  That's the long and short of it.  They

16    lent money, $5 million to SWJ, and in return for a hope for a

17    $12 million bonanza, and what he says to you now is, we got

18    had.  All of these things were known, and we were swindled.

19         But not by Arent Fox.  Arent Fox had no

20    relationship to SWJ.  Arent Fox represented the debtor.  It

21    had a very limited role as escrow agent to hold the funds that

22    Dare decided to loan to SWJ.  It disbursed the funds after

23    there was full disclosure of the so-called forgeries, after

24    all of that was known and knowable to everyone who simply

25    opened their eyes to look at it.  And he comes into court now,

1    and he wants to get your approval, in Utah no less, for

2    shielding his eyes from what was known to, his words,

3    everybody.

4                THE COURT:  I have one other question.  If I

5    transfer it, I would transfer this to the district court.

6                MR. WANG:  Yes.

7                THE COURT:  And Mr. Strojnik is right about that.

8                MR. WANG:  Oh, sure.

9                THE COURT:  And they would do what they would do,

10   with respect to the ongoing bankruptcy, I suppose.

11               MR. WANG:  Yes.  The way it would work, and the

12   judge did the same thing in the Southern District of New York,

13   and this is a well-recognized procedure, is that it's

14   transferred to the district court with a recommendation that

15   it be referred to the bankruptcy court.  Theoretically the

16   district court in Connecticut can say, well, thanks for your

17   recommendation, but I'm not interested.  But as a practical

18   matter that's not -- there's no provision for direct transfer

19   to the bankruptcy court.  That we all understand.

20               THE COURT:  There is not.

21               MR. WANG:  But there is a well-recognized modus

22   operandi where it gets transferred to district court with a

23   recommendation for a referral to the bankruptcy court.  That

24   is exactly what happened in another case that was in the

25   Southern District.

1              THE COURT:  Anything else you want to tell me?

2              MR. WANG:  No, Your Honor.

3              THE COURT:  Thank you both.  I'll take the motions

4    under advisement and get a ruling out in due course.  We'll be

5    in recess.

6              MR. WALLACE:  Thank you, Your Honor.

7         (Whereupon, the court proceedings were concluded.)

8                        *   *   *   *   *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF UTAH       )

2                       ) ss.

3    COUNTY OF SALT LAKE  )

4          I, KELLY BROWN HICKEN, do hereby certify that I am

5    a certified court reporter for the State of Utah;

6          That as such reporter, I attended the hearing of

7    the foregoing matter on September 9, 2011, and thereat

8    reported in Stenotype all of the testimony and proceedings

9    had, and caused said notes to be transcribed into typewriting;

10   and the foregoing pages number from 3 through 30 constitute a

11   full, true and correct report of the same.

12         That I am not of kin to any of the parties and have

13   no interest in the outcome of the matter;

14         And hereby set my hand and seal, this ____ day of

15   _____ 2011.

16

17

18

19

20                 _____

                    KELLY BROWN HICKEN, CSR, RPR, RMR

21

22

23

24

25